[Civ. No. 9134. Third Dist. Nov. 22, 1957.]

JACQUES, INCORPORATED (a Corporation), Appellant, v. STATE BOARD OF EQUALIZATION et al., Respondents.

EVERETT E. HOWARD, Appellant, v. STATE BOARD OF EQUALIZATION et al., Respondents.

McGilvray, McGilvray & Cameron and John P. Carson for Appellants.

Edmund G. Brown, Attorney General, E. G. Funke, Assistant Attorney General, and William T. Chidlaw, Deputy Attorney General, for Respondents.

SCHOTTKY, J.—This is an appeal from two judgments of the superior court denying the appellants' petitions for peremptory writs of mandate praying that respondent State Board of Equalization be commanded to annul its decisions revoking the liquor licenses of appellants and to restore said liquor licenses to appellants.

Everett E. Howard and Carl R. Howard, brothers, were on January 29, 1954, the sole owners of all the shares of stock of a California corporation, Jacques, Incorporated, which in turn held an on-sale general alcoholic beverage license for the premises known as the Showboat. Everett E. Howard also held an on-sale general license for his premises known as the Tower Club. In accusations filed in March of 1954, these brothers were charged with having violated section 24200, subdivision (d), of the Alcoholic Beverage Control Act [Business and Professions Code] and certain Penal Code sections which prohibit lewd and obscene conduct, conducting and participating in gambling and permitting gambling on one's owned or rented property. It was further charged, in general, that the conduct of these brothers was such as to make the continuance of the two liquor licenses contrary to public welfare and morals. In a subsequent amendment to the accusation against Jacques, Inc., it was further charged that Everett and Carl Howard had "procured, counseled, and assisted in the exposing and exhibiting of female entertainers," as alleged in the original accusation for the one date of January 29, 1954, continuously throughout the years 1951, 1952, 1953 and 1954, and particularly November, 1952, December 19, 1952, July or August, 1953, October and November, 1953, and November 6, 1953. In an amendment to the accusation against Everett Howard regarding his license at the Tower Club, the same additions were made insofar as the lewd shows were concerned as in the amendments to the Jacques, Inc. accusation. Everett Howard was further charged, however, with conducting gambling operations of the same type alleged in the original accusations continuously throughout the years 1951, 1952, 1953 and 1954.

A consolidated hearing was held on the accusations and a proposed decision rendered by the hearing officer assigned to hear the cases. The hearing officer in both cases found that Everett and Carl Howard were the sole owners of all the shares of stock of Jacques, Inc. and that they were both convicted of violating section 330 of the Penal Code for unlawfully gambling at premises known as Helvetia Park.

It was also found that the two brothers, as sole stockholders, had the "sole and complete direction and control of the activities of the above-entitled corporation."

In connection with the lewd show on January 29, 1954, the hearing officer found that Everett and Carl Howard did "procure, counsel, and/or assist four female entertainers or performers in exposing and exhibiting themselves to public view [at Helvetia Park], . . . and that such exposure and exhibition upon the part of these females was offensive, indecent, and lewd, and designed to excite vicious or lewd thoughts upon the part of the patrons there assembled." It was further found that said show was given on premises owned and controlled by Everett Howard and that such conduct upon the part of these brothers was contrary to public welfare and morals and constituted a violation of section 311 of the Penal Code.

The charges contained in the amendments to the original accusations were designated as Count III in the proposed decision. As to those charges the hearing officer found that Everett Howard "did, during the month of October, 1953, and on three occasions during the month of November, 1953, procure, counsel and assist in the exposing and exhibiting of female entertainers to public view in violation of the provisions of Article XX, Section 22 of the California Constitution and of section 311 of the Penal Code," such conduct being contrary to public welfare and morals and said exhibitions being similar to those referred to in Count II of the accusations. The hearing officer found that there was not sufficient evidence to support the charges of similar conduct on other dates in regard to the promotion of lewd shows at Helvetia Park.

In the Determination of Issues, the hearing officer found that there had been violations of sections 330 and 331 of the Penal Code relating to gambling but that such conduct occurred off the licensed premises and did not warrant suspension or revocation of the licenses. He further found that violation of Penal Code, section 330, did not constitute a crime involving moral turpitude. However, as to Count II of the accusations he found violations of section 311 of the Penal Code and determined that the continuance of the licenses would be contrary to public welfare and morals. A similar determination was made as to Count III of the accusation.

In his recommendation of the penalty to be imposed the hearing officer felt that Count I should be dismissed but that

both Counts II and III individually constituted good cause for revocation of the licenses.

The proposed decision of the hearing officer was not adopted by the Board of Equalization but instead the board ordered a hearing at which the transcript of the hearing by the hearing officer was considered and counsel for both sides presented oral argument. The decisions of the board varied from the proposed decisions of the hearing officer only insofar as Count I was concerned. Like the hearing officer, the board found that the brothers had conducted, participated in and allowed gambling on premises owned by Everett Howard and that they had been convicted under the applicable Penal Code statutes. The board itself further found that the offenses relating to the gambling operation did not constitute crimes involving moral turpitude. However, the board did determine, unlike the hearing officer, that the actions of these brothers were contrary to public welfare and morals and constituted grounds for the revocation of the two licenses within the meaning of article XX, section 22, of the California Constitution.

The board found, as did the hearing officer, that Everett Howard participated in procuring, counseling and assisting the lewd shows at Helvetia Park that were charged in Counts II and III and further determined that such participation was contrary to public welfare and morals and constituted grounds for the revocation of the two liquor licenses. The board ordered that each of the licenses be revoked for the facts found to be true as to Counts I, II and III in each accusation separately and severally.

Appellants contend most vigorously that there is no substantial evidence to support the decision of the respondent board and the judgment of the court. They contend also that the respondent board erred in disregarding the corporate entity of appellant Jacques, Incorporated.

■ Both appellants and respondent agree that the law as to the scope of review to be applied in this case is as stated by this court in *Marcucci* v. *Board of Equalization*, 138 Cal. App.2d 605, at page 608 [292 P.2d 264] :

"The respondent board with respect to its functions in controlling and regulating the sale and use of intoxicating beverages is a constitutional agency. (Cal. Const., art. XX, § 22, prior to its amendment in 1954.) The scope of review of its decisions is, therefore, limited to determining whether or not there is substantial support therefor to be found in

the record, and both the superior court in mandate proceedings brought before it and this court upon appeal are without authority to reweigh the evidence. (*Covert* v. *State Board of Equalization,* 29 Cal.2d 125, 131-132 [173 P.2d 545] ; *Moore* v. *State Board of Equalization,* 76 Cal.App.2d 758, 762-763 [174 P.2d 323]. See also *Boren* v. *State Personnel Board,* 37 Cal. 2d 634 [234 P.2d 981].) In determining whether or not there is substantial evidence in support of the administrative decision, conflicts in the evidence must be resolved in favor of that decision and all legitimate and reasonable inferences must be indulged in its support. [Citing cases.]''

Before discussing the contentions of appellants we shall give a brief summary of the evidence, bearing in mind that all conflicts in the evidence must be resolved in favor of respondent board's determination and all legitimate and reasonable inferences must be indulged in in its support.

The evidence in this case shows without conflict, and it was so found by the board, that at Helvetia Park, on at least four occasions in October and November of 1953 there were lewd, obscene and immoral shows presented and movies shown to large audiences. That acts of sexual intercourse between men and women were shown in person on the stage and depicted in movies. That nude women performed lewd, obscene and immoral dances before audiences at the times mentioned. That in both the movies and in person acts of perversion were performed before the gatherings of men.

During the periods of time involved herein Everett Howard and his wife owned and controlled the premises known as Helvetia Park and on at least several occasions Everett Howard was present while the above-mentioned shows were being presented and did nothing to stop them.

On the evening of January 29, 1954, nine special agents of the Department of Justice of the State of California spent a period of three and one-half to four hours in attendance at what was referred to as a ''stag'' show at Helvetia Park. These agents observed two lewd and obscene performances by four different women, and during the period when the performances were not being given, the agents engaged in and observed gambling activities in a room set up for that purpose. The agents stated that they each had paid $1.00 admission to gain admittance to the premises and that there were approximately 300 men present.

The agents testified that both Carl and Everett Howard were present during the evening and that also present was a

man named Chester Howard, a cousin of the Howard brothers and the caretaker of Helvetia Park. Everett Howard was seen both in the room in which the lewd performances by the women were given and in the gambling room. Carl Howard was a dealer at one of the blackjack tables. The testimony indicates without contradiction that in the room set aside for gambling were two crap tables, two blackjack tables, and a chuck-a-luck table. Both chips and money were used in the gambling in this room. The testimony further indicates that operating these various games were people who had formerly worked in commercialized gambling establishments in Nevada and elsewhere. The agents testified that Everett Howard was in the gambling room during most of the evening, circulating around among the various games and appeared to be in charge of this gambling operation. Furthermore, Everett Howard admitted in effect that he was in charge of the gambling. The following testimony by Agent White, found on page 105 of the transcript of the hearing of April 20, 1954, shows that Everett Howard admitted he was in charge together with his brother Carl. Agent White testified as follows, referring to Everett Howard:

"He was kind of sore about it I think for the moment, and he says, 'If you want to raid something, why don't you come over to Woodland next Saturday night. We're going to put on the same kind of a show for the Elks over there.'

"That's about all the conversation there was, except that I did ask him, I said, 'Who's in charge of the gambling operation here?'

"He said, 'We are,' and I asked him how—'Who do you mean by "we," and just exactly what his answer was, I don't recall.

"He says, 'My brothers and I,' or, 'I and my brothers, I and Carl.' I'm sure he mentioned Carl, but whether he mentioned Chester I'm not sure, that he mentioned Chester's name.

"Q. But he did say he and Carl were in charge of the gambling? A. As I recall, yes."

Everett Howard's vital concern with the gambling operation is further illustrated in the following testimony of Agent Franke, found on page 38 of the transcript of the hearing on April 20, 1954:

"Well, on one occasion, as I was counting the money at one of the tables, Mr. Everett Howard asked me what I was going to do with the money. I said it was being confiscated as evidence, and would be turned over to the Sheriff for

safekeeping, and he asked me whether he could get it back, and I said, 'Well, I don't know.' . . .''

In connection with the lewd and obscene performances of the four women that night, there was testimony that Everett Howard was in the room in which these performances were given and made no effort to stop them. Chester Howard, the caretaker of Helvetia Park who worked for Everett Howard and who was present that evening, at one point in the second performance by the women that evening got on the stage and attempted to quiet the male spectators in order that the show might continue.

The type of show put on at Helvetia Park this night is clearly shown by testimony of the Department of Justice agents. A detailed description of the lewd and obscene acts of these women on the stage at Helvetia Park on January 29, 1954, appears in the voluminous transcript consisting of more than 350 pages of testimony. These immoral performances continued until the announcement by the agents that the premises were being raided.

It was stipulated at the hearing that the Howard brothers owned all of the shares of stock in Jacques, Inc., the holder of one of the on-sale general liquor licenses at the time the activities of January 29, 1954, occurred. In respect to the gambling activities on the night of January 29, 1954, Carl and Everett Howard were convicted of violating the state gambling laws. The girls who participated in the lewd show on January 29, 1954, were convicted of violating Penal Code, section 311, relating to lewd shows.

Appellant Everett Howard denied any responsibility for or participation in the lewd performance or the gambling operations on the Helvetia Park premises. He testified that the park was rented to a veterans' organization for that date, for a "smoker," at a rental of $125 or one-half of the gross proceeds, and that he was on the premises that night so that he would get his rent as he might not get it otherwise. He testified that the man who called him about renting Helvetia Park for the night in question was Elby Smith who had been in business with him in Nevada and had worked as a gambler there. He testified further that he spent practically all of his time on the premises in the small room where gambling was conducted and that he did not go into the main dance hall where the lewd performances were conducted and did not observe the performances. However, the following appears in his testimony:

"Q. Now, we've got you going in and out of this room when the show had not progressed to its point of extreme lewdness, and you still say you weren't in the room when the show was being given in its entirety? A. Not that I can remember.

"Q. Well now, just a minute ago you were positive about it. Now you can't remember. Now which is it. Is it possible you might have been in that room? A. Well, it could be possible, but I don't remember at any time that I was in there when——

"Q. So if I say you did or you were, you couldn't under oath tell me I was wrong? A. No, I don't remember.

"Q. I say if I said that you were in that room, you under oath couldn't tell me that I'm wrong? A. Well, like I say, I'm in and out—I'm through there—I could have been through there at the time and not even paid any attention to the show. There's quite a gathering of men around the stage which if you didn't go right up I imagine to the stage I couldn't see what was going on anyway. I could have went through the building or—at the time through the hall, I don't remember.

"Q. Now, if you have no interest in the show other than getting the rental from it or the gambling, why are you even present that night? A. To get my money. If I don't get my money that night I never get it.

"Q. You make the profit, I take it, from these shows? A. I wouldn't say the show. From the rental of the park. They rent the whole park. The whole complete park, and I'm there to receive my rent.

"Q. And you receive the money from the man who engages your property to put on these shows? A. I wouldn't say put on these shows. I receive the money from anyone that rents the property."

There was other testimony tending to support the testimony of appellant Everett Howard but such evidence merely created a conflict. The weight to be given to the evidence was for the respondent board to determine. We think there is substantial evidence to support the finding that appellant Everett Howard did participate in procuring, counseling and assisting the lewd shows at Helvetia Park. From his admitted knowledge that lewd performances had been given at Helvetia Park on several past occasions, from his former association with the men who rented the park from him, from his failure at any time to do anything to stop the lewd performances, and from the fact that because of the rental terms

he was to some extent a partner in the enterprise, it was entirely reasonable for the respondent board to conclude that he participated in procuring, counseling and assisting the lewd shows. It requires little stretch of the imagination to infer that the lewd shows were used as a magnet to attract a large group of men for the benefit of the gambling operations and there can be no doubt as to the connection of appellants with the gambling operations.

Appellant Everett Howard contends that the respondent erred in finding that his conduct with reference to the hereinbefore described lewd performances on premises other than the licensed premises was contrary to the public welfare and morals and constituted a ground for the revocation of the liquor license for the Tower Club.

Respondent points out that section 22 of Article XX of the Constitution of California granted to the Board of Equalization the exclusive power to license the manufacture, importation and sale of intoxicating liquors in this state, and the power ". . . in its discretion, to deny or revoke any specific liquor license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals." The board was given broad discretion under the Constitution to determine what constitutes good cause for the suspension or revocation of a license, that is, the power to determine when the continuance of the license would be contrary to public welfare and morals. (*Moore* v. *State Board of Equalization* (1946), 76 Cal.App.2d 758 [174 P.2d 323], and *Hansen* v. *State Board of Equalization* (1941), 43 Cal.App.2d 176 [110 P.2d 453].) These cases point out that the board's powers are not limited to the statutory provisions but also come from the Constitution.

 We believe that it was within the power of respondent board to determine that the conduct of appellant Everett Howard with reference to said lewd performances was of such a nature as to make his holding of an on-sale liquor license contrary to the public welfare or morals. Such conduct certainly cannot be reconciled with good moral character and that the good moral character of a liquor licensee is always material and many times crucial in determining whether or not a person should be issued a liquor license or allowed to continue as a licensee is not open to serious question.

Appellants do not contend that the finding of respondent board that appellants had conducted, participated in and allowed gambling on premises owned by appellant Everett

Howard and had been found guilty of such offenses is not amply supported by the record but do contend most earnestly that the offenses relating to gambling do not involve moral turpitude, and could not constitute grounds for the revocation of the liquor licenses. They point to the finding by respondent board that the offenses relating to the gambling operations did not constitute crimes involving moral turpi- However, the board also found that appellants "did . . . open and cause to be opened and conducted unlawful games of chance and gambling, and in particular games of Twenty-one, banking and percentage games played with dice, contrary to and in violation of sections 330 and 331 of the California Penal Code." This finding, which is amply supported by the record, indicates that both appellants were in effect promoting and conducting professional gambling operations on premises owned by one of them, and supports and justifies the conclusion of respondent board "that the participation by said Howards in the gambling offenses as found herein, and their convictions of violations of section 330 of the Penal Code, were and are contrary to public welfare and morals, and constitute grounds for the revocation of respondent's license within the meaning of section 22 of article XX of the California Constitution."

Appellants make the further contention that the liquor license held in the name of Jacques, Incorporated, could not be revoked for the illegal conduct of appellants who were the sole stockholders of the licensed premises. Appellants argue that the acts of appellants for which the license was revoked were committed off the licensed premises and were unrelated to the corporate purpose. We believe that this contention is fully and correctly answered in the memorandum opinion of the learned trial judge, as follows:

"As to the corporation's license, it is contended by petitioners that petitioner Jacques being a corporation and the license standing in the name of the corporation, the acts of the owner of the stock could not be made a basis for revocation of the corporation's liquor license. The evidence discloses that Everett E. Howard and his brother, Carl Howard, were the owners of all of the capital stock of the corporation, and that while the liquor license was held by the corporation, all of the rest of the property known as the Show Boat, and which was the premises for which the liquor license was issued, was held by the said two brothers as individuals.

"It appeared from the evidence that while the corporation

may have had a minute book, yet no minutes were kept; no meetings were held; so far as the evidence disclosed, no directors had been elected; that no meetings were held either by the stockholders or by any officers of the corporation; that they had a bookkeeper who attended to tax and other routine matters; that the Howards considered themselves as the only owners, and that they could do as they pleased in the management and control of the licensed business and of the property used in connection with the purposes of the liquor license.

■ "In the case of *Maxwell Café* v. *Department of Alcoholic Beverage Control*, 142 Cal.App.2d 73 [298 P.2d 64], the question as to whether a corporation may be considered in law as the alter ego of the persons composing it was involved, and at page 78 of the decision the Court said:

" 'Generally a corporation is a distinct legal entity separate from its stockholders and from its officers. ■ There are circumstances in which the corporate entity will be disregarded and the corporation will be considered in law as the *alter ego* of the persons composing it, as when the corporation is but the instrumentality through which one or more persons, the sole owners of the capital stock, for convenience transact their business and injustice to third persons results from the double relationship. . . . There must be affirmative proof or direct inference from proof that there is such unity of interest and ownership as indicates a cessation of the individuality and separateness of the individuals and the corporation.'

. . . . . . . . . . . . .

■ "Under the views as shown by the evidence in this case, and the application of these facts to the principles of law stated in the Maxwell case, I am of the opinion that Everett Howard and Carl Howard were the real parties involved and were the alter ego of the corporation, and that their acts were the acts of the corporation also."

We are satisfied that there is ample evidence to support the finding of respondent board that appellants as sole owners of all the stock of Jacques, Incorporated, the corporate licensee, at all times had "the sole and complete direction and control of the activities of said corporation." Under the evidence shown by the record, and hereinbefore detailed, Jacques, Incorporated, was the *alter ego* of appellants Everett Howard and Carl Howard, and said appellants were the persons who were operating the on-sale liquor business under said license. Therefore, when the respondent board found that because of the acts of appellants, as hereinbefore set forth, the contin-

uance of the license which was owned and controlled by them would be contrary to public welfare or morals, we do not believe that said appellants may avoid the penalty of their acts by seeking to hide behind the corporation. ▮▮▮ For as stated in Ballantine on Corporations, at page 293:

". . . [B]ut, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." (See also *Taylor* v. *Newton,* 117 Cal. App.2d 752 [257 P.2d 68].)

And as stated in *Ciro's of San Francisco* v. *State Board of Equalization,* 142 Cal.App.2d 636, at page 640 [299 P.2d 636]:

". . . It requires no extended argument to prove that premises licensed to dispense alcoholic beverages should not be operated by law violators, . . .. Even though there was no evidence in this case of questionable activities at Ciro's, the flouting of the law by petitioner, the importance of a strict enforcement of the law as to the character of the persons to be permitted the privilege of liquor licenses, the danger to the public welfare and morals to which the corporation subjected the public by employment in the capacities here shown of men with prohibited backgrounds, and the circumstances of this case, negative any contention of abuse of discretion in the penalty imposed."

Appellants make the further contention that respondent board for many years took the position "that gambling by a licensee off-premises was not grounds for revocation, and because of the reliance upon that position by the appellants, the Board was estopped to revoke the licenses herein on such grounds, until notice of a change of position, by rule or resolution, was given to the appellants."

There is no merit in this contention, for, as pointed out by respondent, this point has been raised in many cases involving governmental agencies in the past. ▮▮▮ However, the rule is clear as is set forth in 2 California Jurisprudence 2d, Administrative Law, in section 74:

"In exercising its sublegislative powers, an administrative agency may not circumscribe or restrict the power and authority conferred upon it by the legislature. And, except in exceptional circumstances, estoppel may not be invoked to limit administrative power. Hence statements of policy, or administrative opinions interpreting laws or regulations, will

not prevent the agency from taking subsequent action inconsistent therewith."

■ This principle is further illustrated in the following quotation from 1 American Law Reports 2d, at page 341, the section dealing with estoppel against governmental bodies:

"The principles of equitable estoppel cannot be applied to deprive the public of the protection of a statute because of the mistaken action or lack of action on the part of public officials."

■ The general rule is that a governmental agency may not be prevented from taking action by its past conduct where the public welfare is involved, as in the present case. In *San Diego County* v. *California Water & Tel. Co.*, 30 Cal.2d 817, the court illustrated this when it said at page 826 [186 P.2d 124, 175 A.L.R. 747]:

". . . It is clear, however, that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public." See also *United States Fidelity & Guaranty Co.* v. *State Board of Equalization*, 47 Cal.2d 384 [303 P.2d 1034].

No other points raised require discussion.

In summary we conclude that the record supports the findings of respondent board and that the board did not abuse its discretion in revoking the liquor licenses of appellants. As hereinbefore pointed out, respondent board was given the power under our state Constitution to determine what is good cause for the suspension or revocation of a liquor license, that is, the power to determine when the continuance of the license would be contrary to public welfare and morals. ■ It is of course true that it is the policy of the state, as shown in the Constitution and statute, that there be strict regulation of business of selling alcoholic beverages, and the good moral character of licensees is extremely important in such regulation. ■ As stated by the United States Supreme Court in *Crowley* v. *Christensen*, 137 U.S. 86 [11 S.Ct. 13, 15, 34 L.Ed. 620], quoted with approval in *Ritz* v. *Lightston*, 10 Cal. App. 685, 688 [103 P. 363, 367]:

". . . There is no inherent right in a citizen to thus sell intoxicating liquors by retail; it is not a privilege of a citizen of the State or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils. The

manner and extent of regulation rest in the discretion of the governing authority.''

We cannot hold that the conclusion of respondent board that these appellants are not fit and proper persons to engage in the retail liquor business is not supported by the record, nor can we hold that the revocation of appellants' liquor licenses is not within the power and discretion of respondent board. We believe it was within the power of respondent board to conclude that in the view of the acts and conduct of appellants, as shown by the record in the instant case, they were not fit and proper persons to engage in the retail liquor business, since such business is so surrounded by law and by restrictive provisions of the Alcoholic Beverage Control Act and various rules and regulations. While it may be conceded that not every violation of the penal statutes of this state would constitute a good cause for revocation of a liquor license, the conduct of the licensees of this case has been such that it is difficult to imagine that anyone could say that acts done by these licensees did not reflect and very forcefully demonstrate that they are not persons of good moral character.

The judgment is affirmed.

Van Dyke, P. J., and Warne, J. pro tem.,* concurred.

A petition for a rehearing was denied December 19, 1957, and appellants' petition for a hearing by the Supreme Court was denied January 15, 1958. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.