[No. A033205. First Dist., Div. Four. Jan. 30, 1987.]

IOLA SULLIVAN, Plaintiff and Respondent, v.
JAMES P. FOX, as District Attorney, etc., Defendant and Appellant.

[No. A033761. First Dist., Div. Four. Jan. 30, 1987.]

ARTICHOKE ENTERPRISES, INC., et al., Plaintiffs and Respondents,
v.
JAMES P. FOX, as District Attorney, etc., Defendant and Appellant.

674

COUNSEL

James P. Fox, District Attorney, and Mark R. Forcum, Deputy District Attorney, for Defendant and Appellant.

Leslie A. Williams, Wilbur Duberstein, Robert J. Kahn and Corey, Orton, Luzaich & Gemello for Plaintiffs and Respondents.

James F. Ernst, Ernst & Coyle, Peter Wallin, Elwayne E. Smith, City Attorney (Huntington Park), Joseph Remcho, Kathleen J. Purcell, Julie M. Randolph, Charles C. Marson, David Manning Chodos, Richard A. Fond, David F. Offen-Brown, Alexander, Millner & McGee, Remcho, Johansen & Purcell, Jerry M. Hill and Kenneth W. Kossoff as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**POCHÉ, J.**—The issue presented on these consolidated appeals is whether law enforcement officials were properly enjoined from preventing the game of pai gow being played at commercial gaming establishments.

Plaintiffs operate licensed gaming clubs in the cities of San Mateo and San Bruno. As of the spring of 1985,[1] the playing of pai gow had either already commenced or was anticipated to begin shortly. In conjunction with these developments, plaintiffs attempted to obtain assurances from local police departments and the District Attorney of San Mateo County that the playing of pai gow would not expose them to criminal liability. These efforts were effectively terminated by a letter circulated to law enforcement agencies throughout the state in April by the Attorney General. In this letter the Attorney General stated his conclusion that when pai gow was played as either a "banking or percentage game" it was prohibited by Penal Code section 330.

Action No. 299638 was initiated in August when plaintiff Sullivan filed a complaint for declaratory and injunctive relief. In addition to recounting the above events, plaintiff alleged that the playing of pai gow had already been judicially determined to be compatible with section 330: plaintiff attached copies of recent superior court orders enjoining law enforcement officials in Los Angeles and Alameda Counties from interfering with pai gow playing as specified in the orders.[2] Plaintiff further alleged that, despite being

---

[1]Dates mentioned refer to the calendar year 1985.

[2]The Los Angeles order (Huntington Park Club Corp. v. City of Huntington Park et al., Los Angeles Super. Ct. No. C 527544) was filed on January 18th. The Alameda order (Walker et al. v. Meehan et al., Alameda Super. Ct. No. 599198-7) was filed on July 8th.

The two orders are virtually identical in form and content. In each the court found that pai gow is not a banking or percentage game prohibited by section 330. The defendants were then enjoined from "preventing, or otherwise interfering, with the playing" of pai gow, which is described in the Alameda order as follows:

"(a) The game of 'Chinese' Pai Gow is played with domino-like tiles.

informed of these orders, police and the district attorney had advised that arrests would be made and plaintiff's establishment would be closed if pai gow was played.

The matter of plaintiff's application for injunctive relief was submitted on the basis of declarations and argument heard by the trial court at a hearing. On September 16th the court filed an order granting plaintiff a preliminary injunction adopted verbatim from the one issued by the Alameda court. (See fn. 2, *ante*.)

Action No. 302073 commenced two months later with the filing of another complaint for declaratory and injunctive relief, the allegations of which were substantially similar to those in action No. 299638. The only material difference between the two complaints was that plaintiffs in the later action were able to claim the support not only of the Los Angeles and Alameda orders, but also the injunction issued in action No. 299638 and an order for injunction granted by the superior court of San Joaquin County.[3] Plaintiffs' application for a preliminary injunction was submitted for decision on the basis of declarations. Filed on December 2d was an order for a preliminary injunction which is indistinguishable from that issued in action No. 299638.

"(b) In each round of play, there is one hand out of eight maximum hands dealt which is designated as the dealer hand. More than one participant may wager on a hand.

"(c) A minimum wager may be required of each participant with no other minimum wager required of the participants.

"(d) A minimum wager of the same amount may be required of the participant designated to receive the dealer hand for a given round of play. In any given round of play, the participant designated to receive the dealer hand is required to place a fixed wager (fixed wager means that the dealer, once he bets cannot change his bet during the round of play).

"(e) The dealer position continually and systematically rotates amongst each of the participants.

"(f) Plaintiffs do not participate whatsoever in the actual play of the game, and have no interest in the outcome of play.

"(g) Plaintiffs may charge a rental fee which may be based upon the amount of each participant's winnings, or the amount of each participant's bet, or the time that each participant plays. At no time do plaintiffs place bets, collect winnings or pay losses.

"(h) A round of play terminates either when all participants' hands are played and wagers are settled, or when the dealer position wins or loses the amount it wagered, whichever occurs first. Thus, in any given round of play anywhere from only two hands to all eight hands dealt will actually be played.

"(i) No participant ever plays against or makes a wager against plaintiffs."

An appeal from the Los Angeles order was recently dismissed by the Second Appellate District (B011145). An appeal from the Alameda order is currently pending in Division One of this court (A033077).

[3]The San Joaquin order (Cameo Club, Inc. v. City of Stockton et al., San Joaquin Super. Ct. No. 186887) was filed on October 2d. In form and content it is generally similar to the previously filed orders. (See fn. 2, *ante*.) No appeal was taken from this order.

Timely notices of appeal from both orders were filed by the district attorney, who is the sole appellant.

Section 330 declares guilty of a misdemeanor "[e]very person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, stud-horse poker, seven-and-a-half, twenty-one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of said prohibited games." ■ Section 330 is only one of many state statutes dealing with gambling, which nevertheless leave considerable scope for local regulation because the state has not preempted the field. (*In re Hubbard* (1964) 62 Cal.2d 119, 125-127 [41 Cal.Rptr. 393, 396 P.2d 809]; *People* v. *Mason* (1968) 261 Cal.App.2d 348, 350 [68 Cal.Rptr. 17].) No county or city ordinance is involved here; the sole enactment is section 330.

Pai gow is not one of the games specifically mentioned in section 330. The question of its legality or illegality thus depends upon whether it qualifies as either a banking or a percentage game. ■ This is an issue of law. (*People* v. *Carroll* (1889) 80 Cal. 153, 157 [22 P. 129]; *People* v. *Hardy* (1969) 271 Cal.App.2d 322, 327 [76 Cal.Rptr. 557]; *People* v. *Ambrose* (1953) 122 Cal.App.2d Supp. 966, 969 [265 P.2d 191].)

As originally enacted in 1872, section 330 prohibited "any banking game." An 1885 amendment expanded this to "any banking or percentage game." (Stats. 1885, ch. 145, § 1, p. 135.) ■ Banking game has come to have a fixed and accepted meaning: the "house" or "bank" is a participant in the game, taking on all comers, paying all winners, and collecting from all losers. (*People* v. *Carroll, supra,* 80 Cal. 153 at pp. 157-158; *In re Lowrie* (1919) 43 Cal.App. 564, 566-567 [185 P. 421]; *People* v. *Ambrose, supra,* 122 Cal.App.2d Supp. 966 at p. 970; 38 C.J.S., Gaming, § 1, pp. 38-39.) No comparable definition of what constitutes a percentage game has been developed. Our duty in undertaking this task is to proceed on the assumption that the Legislature's use of disjunctive language was purposeful and in keeping with the ordinary sense of terminology importing separate meanings to the differentiated categories. (See *People* v. *Anderson* (1972) 6 Cal.3d 628, 636-637 [100 Cal.Rptr. 152, 493 P.2d 880]; *Tyson* v. *Burton* (1930) 110 Cal.App. 428, 432 [294 P. 750]; 1A Sutherland, Statutory Construction (Sands 4th ed. 1985) § 21.14, pp. 127-128.) As a corollary to the rule requiring significance and useful meaning to be given to each word, construction of section 330 should avoid making any word surplusage. (See *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 36-37 [160 Cal.Rptr. 710, 603 P.2d 1306]; *Merandette* v. *City and County of San Francisco* (1979) 88 Cal.App.3d 105, 113 [151 Cal.Rptr. 580].) With these principles in mind, stating a definition of a percentage game is not difficult.

Section 330 embodies several differing approaches to gambling regulation. Those games specifically mentioned are banned outright. Rather than undertaking numerous piecemeal amendments every time a new game is deemed worthy of prohibition, the Legislature adopted the "banking or percentage game" test as a flexible means of reaching two evils perceived by the Legislature. The first pertains to situations where the house is actually involved in play, its status as the ultimate source and repository of funds dwarfing that of all other participants in the game. This is covered by section 330's prohibition against banking games. The other situation finds the house in a more passive role. Where the house is not directly participating in game play, it can still be involved if it collects a percentage from the game. This percentage may be computed from the amount of bets made, winnings collected, or the amount of money changing hands. The percentage may be assessed collectively or individually. Regardless of the precise formula employed, the house benefits. The house has no interest in the outcome of play, but it is far from disinterested in the amount of play. It is in the enviable position of obtaining profit without incurring risk of loss from the actual play. Its actual participation is nil, thereby distinguishing it from the banking game situation, but it nevertheless gains. In any event, the house derives benefit from commercial gambling, the elimination of which is the legitimate objective of statutes such as section 330. (See *Jacques, Inc.* v. *State Bd. of Equalization* (1957) 155 Cal.App.2d 448, 459 [318 P.2d 6]; *People* v. *Sullivan* (1943) 60 Cal.App.2d 539, 542-543 [141 P.2d 230].)

██ We construe the language in section 330 referring to percentage game as encompassing any game of chance from which the house collects money calculated as a portion of wagers made or sums won in play, exclusive of charges or fees for use of space and facilities. (See *People* v. *Ambrose, supra,* 122 Cal.App.2d Supp. 966 at p. 970.) This definition comports with the broad sweep of section 330 (see *People* v. *Sam Lung* (1886) 70 Cal. 515, 516 [11 P. 673]) and with the applicable rules of statutory construction cited previously. Parenthetically, it may be noted that our definition of percentage game accords with that adopted in an analogous context by the state which has the greatest acquaintanceship with commercial gambling. Nevada, for purposes of its taxation statutes, accepts that "[p]ercentage games are . . . games where patrons wager against each other and the house takes a percentage of each wager as a 'rake-off.' " (*Hughes Properties, Inc.* v. *State* (1984) 100 Nev. 295 [680 P.2d 970, 971].)

Plaintiffs in action No. 302073 and numerous amici challenge our definition on several grounds. The former submit that the chapter and section headings indicate that the only conduct prohibited by section 330 is "gaming," which they equate with actual participation in play, something they do not do. ██ Although chapter and section headings are legitimate

extrinsic aids in construing ambiguous statutory language (see *In re Bandmann* (1958) 51 Cal.2d 388, 392 [333 P.2d 339]; *Barnes* v. *Jones,* (1876) 51 Cal. 303, 306; *People* v. *Rocca* (1980) 106 Cal.App.3d 685, 691-692 [165 Cal.Rptr. 226]; *People* v. *Weltsch* (1978) 84 Cal.App.3d 959, 965 [149 Cal.Rptr. 112]; 2A Sutherland, Statutory Construction, *supra,* § 47.14, p. 151), they cannot be employed here in the fashion plaintiffs suggest. The plain language of section 330 demonstrates beyond any doubt that its ambit is not limited to actual players. (See *People* v. *Sam Lung, supra,* 70 Cal. 515 at p. 516.) There is no ambiguity which recourse to the chapter and section headings would resolve and the statute's plain language must consequently govern. (*In re Bandmann, supra,* at pp. 392-393; *People* v. *Rocca, supra,* at pp. 691-692.)

Amicus Huntington Park Club Corporation (see fn. 2, *ante*) discerns in the language of section 330 an appropriate instance for application of the doctrine of *ejusdem generis.* This rule of statutory construction, "which is particularly applicable to criminal statutes, provides that where general words follow specific words in an enumeration, the general words are construed to embrace things similar in nature to those things enumerated by the preceding specific words." (*People* v. *Hernandez* (1978) 90 Cal.App.3d 309, 315 [155 Cal.Rptr. 1]; see *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Overly* (1985) 171 Cal.App.3d 203, 209 [216 Cal.Rptr. 924]; *People* v. *McKean* (1925) 76 Cal.App. 114, 119-121 [243 P. 898].) The function of this rule is to avoid having either the general or the specific subjects reduced to redundant surplusage if the overlap between them can be harmonized. (See *Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676]; 2A Sutherland, Statutory Construction, *supra,* § 47.17, p. 166.)

Amicus argues that each of the games specifically enumerated in section 330 possesses the following characteristics: "(1) the house always banks the game, taking on all other players, taking in all losses and paying out all winnings; (2) the house always has a percentage advantage over its player-opponents (e.g., the odds are in its favor) that is built into the rules of the game, ensuring that regardless of the luck or skill of the other players, the house will win significantly more often than not; (3) the games are fast and easy to play and involve few decisions to be made by the players; and (4) possibly most important, the house easily can cheat, because the basic simplicity of the games, and the house's control of the devices, renders them more susceptible to manipulation." Based upon these purported characteristics, amicus would limit the reach of section 330's prohibition against percentage games to situations where the house is "actively participating in the playing of games with the opportunity to cheat, and the play of any game

where any player has an unfair advantage over other players by virtue of the rules of the game."

Although the rule of *ejusdem generis* has previously been invoked with regard to the "money, checks, credit, or other representative of value" language of section 330 (*Ex parte Williams* (1906) 7 Cal.Unrep. 301 [87 P. 565 ]), we cannot repeat its application here. As originally introduced, the bill which became the 1885 amendment expanded the existing language of "any banking game" to "any other banking or percentage game." (Assem. Bill No. 111 (1885 Reg. Sess.) § 1.) The word "other" was subsequently deleted from the final version. (Assem. Amend. to Assem. Bill No. 111 (1885 Reg. Sess.) Feb. 4, 1885.) Had "other" remained, amicus' argument would be irresistible. Its omission, however, evidences the Legislature's intention to establish "banking or percentage game" as separate categories of prohibited activity. ■ It being the rule that *ejusdem generis* "will not be applied if it results in a construction inconsistent with the statute's legislative history" (2A Sutherland, Statutory Construction, *supra,* § 47.22, p. 187), we must reject amicus' construction because it would abolish the careful distinctions formulated by the Legislature. (*Kern River Public Access Com.* v. *City of Bakersfield* (1985) 170 Cal.App.3d 1205, 1220 [217 Cal.Rptr. 125].)

Finally, and in a related vein, it is argued that within the gaming industry "percentage game" has a technical meaning substantially synonymous with "banking game." It is true that a noted authority on gambling defines percentage game as "[a] banking game in which a favorable advantage is obtained through offering less than correct odds." (Scarne's New Complete Guide to Gambling (1974) p. 846.) According to this line of reasoning, the category of percentage games prohibited by section 330 is restricted to casino games (which appears to be another technical term of art), such as roulette, craps, blackjack, or keno, where the rules of play and quoted odds confront the ordinary player with an inherent built-in edge favoring the house. In other words, a percentage game is a stacked deck.

This alternative construction has some plausibility, but it does not survive scrutiny. It relegates percentage games to a subspecies of banking games. To accept this would require us to ignore the Legislature's carefully preserved distinction between the two categories. Our duty is to respect this differentiation, not obliterate it by reducing percentage game to meaningless surplusage. (See *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1 at pp. 36-37; *Kern River Public Access Com.* v. *City of Bakersfield, supra,* 170 Cal.App.3d 1205 at p. 1220; *Merandette* v. *City and County of San Francisco, supra,* 88 Cal.App.3d 105 at p. 113.) If percentage game does have a technical meaning, it is not apparent from either the face of the statute or the record (see fn. 5, *post*), and does not compel us to modify our definition

of percentage game. (See *Alalunga Sport Fishers, Inc.* v. *County of San Diego* (1967) 247 Cal.App.2d 663, 666-667 [55 Cal.Rptr. 875]; *In re Anderson* (1939) 34 Cal.App.2d 48, 51 [92 P.2d 1020]; *In re Gundelfinger* (1927) 87 Cal.App. 636, 638-639 [262 P. 465]; 2A Sutherland, Statutory Construction, *supra,* § 47.29, p. 234.) ■ It must now be decided whether plaintiffs' declarations establish that the manner in which they would permit pai gow to be played is outside of that definition.

Plaintiff Sullivan in action No. 299638 filed declarations by herself, the general manager of her club, and the club's "Pai Gow manager." The only part of plaintiff's declaration pertinent here is her statement that she directed the general manager that pai gow "is to be played in a manner consistent with the [Los Angeles] Order." The salient portions of the general manager's declaration are that he was instructed to have pai gow played "in accordance with the rules set forth" in the Los Angeles and Alameda orders, and that the game "is played in a manner entirely consistent with" those orders. ■ ■■■ Similar statements were made by the "Pai Gow manager," who further declared (quoting language from the Los Angeles order) that " 'a rental fee is charged of the participants based upon the amount each participant wagers'."[4]

Plaintiffs in action No. 302073 filed declarations by their respective presidents, each of whom stated that pai gow would be played "in accordance with the rules and conditions set forth" in a proposed order for preliminary injunction identical to the one already issued in action No. 299638. Plaintiffs also filed a declaration by an attorney and law school professor possessing considerable experience with gambling. Much of this declaration involves inadmissible opinions regarding whether pai gow is a banking or percentage game prohibited by section 330. These portions will be ignored. (See fn. 4, *ante.*) The declarant then states that "the rules by which plaintiffs shall play the game at their clubs as have been set forth in [the proposed] preliminary

---

[4]Plaintiff also submitted a copy of a declaration filed in connection with the Los Angeles case. (See fn. 2, *ante.*) The declaration was made by a former Los Angeles County deputy sheriff who describes himself in the declaration as the president of a "gaming consultant firm." Plaintiff's attorney apparently treated this declaration as having been made by an expert witness. The declarant purports to state his opinion that pai gow is not a banking game within the meaning of section 330. This declaration must be disregarded because (1) the interpretation of section 330 involves a question of law beyond the declarant's competence (see *Communications Satellite Corp.* v. *Franchise Tax. Bd.* (1984) 156 Cal.App.3d 726, 747 [203 Cal.Rptr. 779]; *Elder* v. *Pacific Tel. & Tel. Co.* (1977) 66 Cal.App.3d 650, 664 [136 Cal.Rptr. 203]), and thus the declaration could not properly have been considered by the trial court in deciding whether to grant a preliminary injunction (*People* v. *Pacific Land Research Co.* (1977) 20 Cal.3d 10, 21 [141 Cal.Rptr. 20, 569 P.2d 125]; *People* v. *Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 304, 310 [151 Cal.Rptr. 757], disapproved on another ground in *IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 73 , fn. 6 [196 Cal.Rptr. 715, 672 P.2d 121]); and (2) the declaration is irrelevant to the issue of whether pai gow is a percentage game.

injunction order" specify that plaintiffs "receive merely a rental charge based upon the amount of each participant's winnings, the amount of each participant's bet, or the time that each participant plays."[5]

Slightly puzzling is the sole declaration filed by the district attorney in action No. 302073. The declaration was executed by an investigator of the San Jose Police Department, who observed how pai gow was played at the club owned by plaintiff Sullivan (i.e., the plaintiff in action No. 299638) on October 9th (i.e., after the injunction in action No. 299638 had been filed). After the declarant's legal conclusions regarding the applicability of section 330 are disregarded (see fn. 4, *ante*), the only germane surviving statement is his observation that the house collected five percent of the amounts bet on each round of play.

■ It is a familiar principle that an order granting or denying an injunction is to be evaluated in light of the law which is current at the time of review. (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 782 [160 Cal.Rptr. 102, 603 P.2d 19]; *McKeon* v. *Hastings College* (1986) 185 Cal.App.3d 877, 888 [230 Cal.Rptr. 176]; *Alternatives for California Women, Inc.* v. *County of Contra Costa* (1983) 145 Cal.App.3d 436, 446 [193 Cal.Rptr. 384].) ■ Accordingly, the orders granting plaintiffs' injunctive relief are to be measured against the definition of percentage game we have formulated. Each of the injunctions permits the gaming club to "charge a rental fee which may be based upon ... the amount of each participant's winnings, the amount of each participant's bet[s], or the time that each participant plays." The first two methods will qualify as constituting a percentage game. Only the last will be permissible. (See *People* v. *Ambrose, supra,* 122 Cal.App.2d Supp. 966 at p. 970.) None of the declarations filed by plaintiffs comes close to demonstrating that their charges are based solely upon the permissible formula. The evidence on this point is uncontradicted. By any standard, the

---

[5]Amici California Commerce Club and Casino Plaza Limited assert that this declaration "was offered as an expert's clarification of a technical term—percentage game—that has historical significance in the gaming industry." The declaration itself does not support this assertion.

It is noteworthy that the opinions of this attorney, I. Nelson Rose, figured in the showings made by both sides. The district attorney relied upon fragments of a 28-page "Pai Gow—Expert Opinion Report" dated February 18, 1985. Included within the report are the following statements and conclusions by Mr. Rose: "Pai gow is not a percentage game if the house merely rents seats or collects a flat fee that has no relation to the amount bet. . . . Since the house cannot be the banker under the California rules, nor does it take a fixed percentage, the game is not a percentage game. . . . In California pai gow is neither a banking nor a percentage game. The house cannot enter into play at all; the deal rotates to each player in turn and the other players are limited to what the dealer-player is willing to put up as his stake. The house does not collect a flat percentage of all winning bets." Although the absence of the entire report cautions against the possibility of misconstruction, the reasonable import of these excerpts is consistent with our definition of percentage game. If anything, Mr. Rose appears to have anticipated it.

evidence fails to establish with any certainty that plaintiffs will or are conducting pai gow games lawfully; it raises only a possibility that pai gow is being played without violating section 330. The odds are one out of three. Even this may be too optimistic: the undisputed evidence of plaintiff Sullivan's "Pai Gow manager" and the San Jose police investigator establishes that plaintiff Sullivan is operating a percentage game as we have defined that term.

The net effect of the injunctions is to sanction illegal gambling activities and to deprive the district attorney of the power to prosecute violations of section 330. Insofar as the trial courts applied an incorrect legal standard and contravened uncontradicted evidence that plaintiffs were not in conformity with the correct legal definition of a percentage game, those courts abused their discretion in granting the injunctions. (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889]; *Voorhies* v. *Greene* (1983) 139 Cal.App.3d 989, 995 [189 Cal.Rptr. 132]; cf. *California Assn. of Dispensing Opticians* v. *Pearle Vision Center, Inc.* (1983) 143 Cal.App.3d 419, 426 [191 Cal.Rptr. 762].)

The orders are reversed.

Anderson, P. J., and Channell, J., concurred.

A petition for a rehearing was denied February 27, 1987.