[No. H015980. Sixth Dist. Apr. 7, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY ALAN STEFFENS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts C, D, E, F, G and H.

**COUNSEL**

Richard L. Rubin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and Allan Yannow, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MIHARA, J.**—Defendant Gregory Alan Steffens was convicted of acquiring an access card with the intent to defraud (Pen. Code, § 484e, subd. (c)) (the acquisition count), altering access card account information (Pen. Code, § 484f, subd. (c)) (the altering count), fraudulent use of an access card (Pen. Code, § 484g, cl. (a)) (the use count), being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)) and possession of a hypodermic needle (Bus. & Prof. Code, § 4149). He admitted that he had suffered three prior convictions within the meaning of Penal Code sections 667, subdivisions (b) to (i) and 1170.12 and served three prior prison terms within the meaning of Penal Code section 667.5, subdivision (b). He was committed to state prison for a total term of 50 years to life. On appeal, he claims that (1) the trial court's instructions on the use count were inadequate because they failed to define one of the elements, (2) the trial court gave an erroneous response to the jury's inquiry regarding the altering count, and the evidence is insufficient to support the altering count, (3) the court abused its discretion in denying his new trial motion, (4) the revised version of CALJIC No. 2.90 is unconstitutional, (5) his prior convictions did not constitute three prior convictions because they were not brought and tried separately, (6) the trial court was unaware of, and failed to exercise, its discretion to impose concurrent terms for the acquisition and use counts, (7) consecutive life terms are unauthorized and (8) his sentence is cruel or unusual. We modify the judgment by striking the altering count and affirm the modified judgment.

### FACTS

Kevin Brammer made the mistake of disposing of some of his credit card slips by placing them in a recycling bin. On January 17, 1995, an order was placed in Brammer's name from Damark International, a mail-order company. This order was for a spotlight, binoculars and a "wireless observation system." The merchandise was charged to Brammer's credit card. The binoculars were shipped on January 18, the "wireless observation system" on January 19, and the spotlight on January 20. Brammer's January 1995 credit card bill contained a charge for $795.80 for mail-order merchandise from Damark that Brammer had not ordered. He immediately cancelled his credit card and contacted the police.

Two of the three items of merchandise charged to Brammer's credit card were delivered to a Tulipwood Lane address in San Jose on the morning of January 23. The packages were addressed to Brammer. One of the residents at the Tulipwood Lane address was Robert Patterson. Tracy Prevost and Tara Buzzeo were Patterson's friends. Prevost was living at another friend's

house on Ruge Drive, and Buzzeo sometimes spent the night at the Ruge Drive house. Patterson, Prevost and Buzzeo were all methamphetamine users. Buzzeo was also a methamphetamine dealer.

Sometime in late 1994, Prevost's boyfriend, an incarcerated methamphetamine dealer, sent her a letter in which he gave her a phone number for "Greg Steffens" and asked her to contact Steffens on his behalf. Prevost called the number and spoke with a man who identified himself as "Greg." She gave him her telephone number at the Ruge Drive house. Prevost had a couple of telephone conversations with "Greg." On one occasion, she went to his home.[1] She was only there for a couple of minutes. Buzzeo was also acquainted with defendant. She had met him through Prevost's boyfriend before Prevost's boyfriend went to prison. At some point, Buzzeo overheard defendant providing Prevost's incarcerated boyfriend with several credit card numbers and names. Buzzeo spoke with defendant in late December 1994 or early January 1995. She told defendant that she could be contacted at the Tulipwood Lane address and gave him Patterson's phone number to use to reach her.

In January 1995, Prevost received a phone call from "Greg." He asked her to contact Patterson about some packages that were to be delivered to the Tulipwood Lane address because some "friends" of his "needed an address." "Greg" offered to provide Prevost with methamphetamine in exchange for her help in retrieving these packages. Before the packages arrived, Prevost called Patterson and asked him to notify her when the packages arrived. After two packages arrived, Prevost again contacted Patterson and asked him to deliver the packages to her at the Ruge Drive house because she had no car with which to retrieve them. Patterson brought the two packages over to Ruge Drive, and Prevost took the packages from his truck into the house. Prevost told Patterson that Brammer's "friend Greg" was present. She gave Patterson some methamphetamine for his trouble. Less than five minutes later, defendant arrived at the Ruge Drive address, identified himself as "Greg" and retrieved the packages from Prevost's room. He gave Prevost some methamphetamine.

On the evening of January 26, 1995, defendant's residence was searched. Hypodermic syringes and other narcotics paraphernalia were discovered in a garage cabinet. A box containing 30 credit and automated teller machine (ATM) access cards was found on a shelf in the garage. All but one of these cards bore names other than defendant's. These cards were from a variety of institutions. In addition, a group of mutilated credit and ATM access cards,

---

[1] At trial, Prevost could not recall whether this visit occurred before or after her delivery of the packages to defendant.

from a variety of banks and businesses, that had "been tampered with" was found along with "X-acto" knives, an air brush, a "Verifone" device and reflective paper. A notebook was also discovered in the garage. It contained handwritten names, addresses, credit card numbers, expiration dates, toll-free telephone numbers for VISA, Discover and American Express and other information. One of the credit card company phone numbers bore the notation "not automated." On the front page of the notebook was Prevost's first name and her Ruge Drive address and telephone number. This information was followed by Patterson's first name and his telephone number. On other pages of the notebook were the Tulipwood Lane address and Buzzeo's first name and a phone number.

A 1995 calendar found in defendant's garage contained several notations regarding Brammer and the Damark merchandise. The date January 16 bore Damark's telephone number along with an order number which matched the order charged to Brammer's credit card and sent to the Tulipwood Lane address. Brammer's name and the order number were also written on the date January 20. An entry on the date January 25 mentioned Damark and a camera and binoculars. Information about Brammer was found on papers inside a brown portfolio in the garage along with similar information about other individuals and a piece of mail addressed to defendant. One piece of paper contained notations about a camera, binoculars and a spotlight with dollar amounts next to them and the Damark order number. Some of Brammer's pay stubs containing his Social Security number, name, address and zip code were in the portfolio. Brammer's credit card account number and expiration date were also in the portfolio.

On some papers attached to a clipboard found in the garage were additional references relevant to the Damark merchandise and Brammer. Brammer's full name, the name of the institution that issued his credit card and his credit card account number and expiration date were written on one piece of paper. The same piece of paper also contained another person's credit card information, but Brammer's information was circled in a different color ink than the writing. This piece of paper also contained the Tulipwood Lane address and references to a spotlight, a camera and binoculars along with item numbers.

Defendant arrived at his residence during the search. He was under the influence of methamphetamine. He willingly spoke with the police. Referring to the credit and ATM access cards found in his garage, defendant said "I only tried to use those . . . for phone sex stuff but it's not illegal." He claimed to have found these cards in "a Bank of America dumpster" and asserted that they were "all expired or deactivated." When asked how he

knew this, he said " 'cause I tried them at different banks and ATM's around here" when he was "just trying to see if they worked." He stated that he "intended to use them to obtain money or services over the phone or through ATM's." Defendant admitted that he had found the paperwork in the portfolio in "dumpsters." He also acknowledged ownership of the notebook and the papers attached to the clipboard.

Defendant was arrested and charged by information with acquiring an access card with the intent to defraud (Pen. Code, § 484e, subd. (c)), altering access card account information (Pen. Code, § 484f, subd. (c)), possession of incomplete access cards (Pen. Code, § 484i, subd. (b)), possession of stolen property (Pen. Code, § 496), fraudulent use of an access card (Pen. Code, § 484g, cl. (a)), being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)) and possession of a hypodermic needle (Bus. & Prof. Code, § 4149). It was further alleged that he had suffered three prior convictions within the meaning of Penal Code sections 667, subdivisions (b) to (i) and 1170.12 and served three prior prison terms within the meaning of Penal Code section 667.5, subdivision (b). The possession of stolen property count was dismissed on defendant's Penal Code section 995 motion. The prior conviction and prison prior allegations were bifurcated, and defendant thereafter admitted them. Defendant rejected a pretrial plea bargain offer which would have allowed him to plead guilty to one of the felony counts, admit the prior conviction allegations and receive a sentence of 25 years to life.[2]

At trial, Buzzeo and Prevost testified for the prosecution under grants of immunity. Defendant testified on his own behalf. He denied ever having been to see Prevost at the Ruge Drive house, and he maintained that he had never seen or received the Damark packages. He asserted that Prevost had twice been to his home. On one occasion, she had been with her boyfriend and had not gotten out of the car. The second occasion occurred after her boyfriend's incarceration. Prevost had telephoned defendant asking for his address so that her boyfriend could write to him. Subsequently, she arrived unexpectedly at defendant's home and asked if she "could get some numbers" from defendant for her boyfriend. According to defendant, he told her "Help yourself. If you want to dig for them you can." Prevost "took a couple yellow receipts" and left. Defendant testified that sometime in January 1995 Prevost called him and told him that she had used these "numbers" to "make a phone order" which was "going to be delivered at a friend's house." A week later, Prevost called him and asked him to impersonate Brammer and pick up the packages she had ordered at the Tulipwood Lane address. She

---

[2]At that time, defendant's trial counsel estimated the probability of conviction at "95 to a hundred percent."

gave him some information about this "phone order." He wrote down this information including Brammer's name, credit card number, phone number, item numbers and delivery dates. Prevost also gave him Patterson's phone number. Defendant claimed that Prevost called back a second time and repeated this information. After writing all this information down and considering Prevost's request, defendant asserted that he decided not to follow through on it. He testified that Prevost subsequently told him that she had received the packages.

Defendant admitted that everything found in the garage belonged to him. Defendant denied having mutilated or altered any of the credit cards found in his garage. He claimed that he had found the mutilated cards in that condition. He maintained that he had never heard of Patterson. Defendant denied that he was collecting financial and credit card information about other persons. He stated that he had acquired such material simply because it came with the other trash that he collected in his search through trash for "electronics material." However, he admitted that he had separated out financial statements and credit card receipts from the other trash he collected and had written down names and credit card numbers. Defendant asserted that he had done this solely for the purpose of giving this information to Prevost's incarcerated boyfriend and that he had "no personal use" for it. He admitted that he had never sent this information to Prevost's incarcerated boyfriend.

The jury acquitted defendant of the possession of incomplete access cards count. It convicted him of all of the remaining counts. Defendant's motion for a new trial was denied. Defendant asked the trial court to exercise its discretion under Penal Code section 1385 and strike all or some of the prior conviction allegations. He also asked the court to strike the allegations on the ground that the punishment would otherwise constitute cruel or unusual punishment. The trial court rejected both motions. It imposed 25-year-to-life terms for each of the three felony counts.[3] It selected a concurrent term for the altering count because it concluded that that count was part of the "same transaction" as the acquisition count. Consecutive terms were imposed for the acquisition and use counts. The court struck the prison priors and imposed a total term of 50 years to life. Defendant filed a timely notice of appeal.

DISCUSSION

A. <em>Use Count</em>

■ Defendant was charged with violations of Penal Code sections 484e, subdivision (c) (the acquisition count), 484f, subdivision (c) (the altering

---

[3]Concurrent 30-day jail terms were imposed for the 2 misdemeanor counts.

count) and 484g, clause (a) (the use count). The prosecutor expressly based the use count on defendant's use of Brammer's credit card account number (his "access card") to obtain the Damark merchandise. As to the use count, the court instructed the jury that "[e]very person who, with intent to defraud, uses for the purpose of obtaining money, goods, services or anything else of value, an access card[4]] or access card account information *altered, obtained, or retained in violation of section 484(e) or 484(f)* or an access card which he knows is forged, expired, or revoked, is guilty of theft." (Italics added.) The court's instruction on the acquisition count defined a violation of "section *484(e)*(c) of the Penal Code." (Italics added.) "Every person who sells, transfers, conveys, or receives an access card with the intent to defraud, or who *acquires an access card with the intent to use it fraudulently*, is guilty of grand theft." (Italics added.) The court's instruction on the altering count defined a violation of "*section 484(f)*(c) of the Penal Code." (Italics added.) "Every person who, with the intent to defraud, alters, varies, changes, or modifies access card account information or any part of an access card, including information encoded in a magnetic stripe or other medium on the access card not directly readable by the human eye, or who authorizes or consents to alteration, variance, change, or modification of access card account information by another, in a manner that causes transactions initiated by that access card to be charged or billed to a person other than the cardholder to whom the access card was issued, is guilty of forgery."

Defendant claims that the trial court prejudicially erred by failing to sua sponte define the meaning of the phrase "altered, obtained or retained in violation of section 484(e) or 484(f)" in its instruction on the use count. The Attorney General asserts that the trial court's instructions on the Penal Code section 484e and section 484f counts were adequate to define the meaning of this phrase. We agree with the Attorney General.

Defendant argues that the court's instructions on the Penal Code sections 484e and 484f counts were "insufficient" to define the meaning of the reference to those sections in the use count instruction because the violations of the specific subdivisions of sections 484e and 484f described in those instructions had no application to the conduct involved in the use count. While there was no evidence that defendant's conduct in regard to Brammer's credit card account number violated subdivision (c) of section 484f (which prohibits altering), there was substantial evidence that this conduct

---

[4]Defendant insists that Brammer's credit card account number was "access card account information" rather than an "access card" itself. The jury was instructed with the statutory definition of "access card" which includes not only the physical "card" but also the "account number, or other means of account access . . . ." (Pen. Code, § 484d, subd. (2).) Under this definition, Brammer's credit card account number was clearly an "access card."

violated subdivision (c) of section 484e. "Every person . . . who *acquires an access card with the intent to use it fraudulently*, is guilty of grand theft." (Italics added.) There was substantial evidence that defendant acquired Brammer's credit card account number with the intent to use it fraudulently.

Defendant also maintains that "it was the omitted portions of section 484e and section 484f which would have been important to the jury's resolution of whether defendant was guilty" of the use count. Not so. None of the other subdivisions of Penal Code sections 484e and 484f were applicable to defendant's conduct in connection with the use of Brammer's credit card account number. The trial court did not err in failing to instruct the jury on irrelevant subdivisions of sections 484e and 484f. The trial court's instructions on section 484e, subdivision (c) and section 484f, subdivision (c) were adequate to give meaning to the court's instruction on the use count.

## B. *The Altering Count*

The court's original instruction on the altering count was precisely in the statutory language. "Every person who, with the intent to defraud, alters, varies, changes, or modifies access card account information or any part of an access card, including information encoded in a magnetic stripe or other medium on the access card not directly readable by the human eye, or who authorizes or consents to alteration, variance, change, or modification of access card account information by another, in a manner that causes transactions initiated by that access card to be charged or billed to a person other than the cardholder to whom the access card was issued, is guilty of forgery." The prosecutor briefly summarized his interpretation of the meaning of this statute in his argument to the jury. "If you take one of those cards, simply, and you start monkeying with them, start changing numbers, playing with them, you're guilty of forgery."

During its deliberations, the jury sent a note to the judge asking, in reference to the altering count: "Must a party other than the original cardholder be charged or billed for transactions made on the altered card or card information?" The judge extensively discussed the jury's question with the prosecutor and defendant's trial counsel and considered the grammatical construction of the language in the statute. The judge concluded that the correct answer to the jury's question was "no." "484f(c), after considerable discussion with counsel, seemed to focus on the following issue, which I am going to resolve by grammatical interpretation. . . . The question is whether the phrase, 'in a manner that causes transactions initiated by that access card to be charged or billed to a person other than the cardholder to whom the access card was issued,' whether that phrase pertains to all that

precedes the disjunctive 'or' plus all that follows the disjunctive 'or', or whether it applies to both." "I am now, I believe, forced to interpret this code section grammatically. There is no other way to interpret it, *because there is nothing available through the legislative intent.* Grammatically there is a disjunctive 'or' in this sentence. Therefore, I interpret this code section that everything following the disjunctive 'or' only applies to the second part of the code section. Therefore, the first portion dealing with alteration of an access card, that crime is completed upon the alteration of the card and there is no necessity for any billing to a person other than the cardholder. The crime is complete at the moment of alteration." (Italics added.) "Therefore, going back to the jury's question . . . the answer is no."[5] Both the prosecutor and defendant's trial counsel agreed with the judge's interpretation of the statute.

The judge then brought the jury in and instructed the jury in accordance with this interpretation of the statute. The jury was given a long explanation of the judge's reasoning, but it essentially amounted to the fact that the answer to its question was "no" if it found that defendant had altered rather than consented to or authorized an alteration. "If an access card is altered [with the intent to defraud], the crime is complete. . . . Everything that follows the disjunctive 'or' only pertains to that which follows the disjunctive 'or'. It does not pertain to that which precedes it."

Defendant claims that the trial court's "grammatical construction" of the statute erroneously eliminated an element of the altering offense. His position is that it is an element of the altering offense described in the first part of Penal Code section 484f, subdivision (c) that the perpetrator acted "in a manner that causes transactions initiated by that access card to be charged or billed to a person other than the cardholder to whom the access card was issued." Defendant agrees that the first and second parts of the statute describe different types of liability. However, he claims that the rules of statutory construction support his claim that the final clause of the statute applies to both types of liability. We are compelled to agree.

■ "[I]n construing a statute, a court [must] ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining that intent, we consider the statute read as a whole, harmonizing the various elements by considering each clause and section in the context of the overall statutory framework." (*People* v. *Jenkins* (1995) 10 Cal.4th 234, 246 [40

---

[5]The court was critical of the Legislature's wording of the statute. "[I]f there is a problem, the problem is that of the Legislature and the way that this was drafted." "[T]he Legislature in their infinite wisdom are the ones that write the laws. Those laws then come down to us mere mortal judges and lawyers and we have to interpret them."

Cal.Rptr.2d 903, 893 P.2d 1224].) "[W]e first examine the words of the respective statutes: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." . . . "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' . . ."' . . . If, however, the terms of a statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. . . . 'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'" (*People* v. *Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232], citations omitted.) The rules of construction are subordinate to the primary rule that a statute must be interpreted consistent with legislative intent. (*Estate of Banerjee* (1978) 21 Cal.3d 527, 539 [147 Cal.Rptr. 157, 580 P.2d 657].)

 By arguing about which rule of construction applies in this case, the parties implicitly concede that the words of the statute do not resolve this issue. The wording of Penal Code section 484f, subdivision (c) is amenable to either interpretation. "Every person who, with the intent to defraud, alters . . . access card account information or any part of an access card . . . or who authorizes or consents to alteration . . . of access card account information by another, in a manner that causes transactions initiated by that access card to be charged or billed to a person other than the cardholder to whom the access card was issued, is guilty of forgery." The words of the statute alone do not reflect whether or not the last clause was intended to apply to both the alterer and the authorizer or just to the authorizer. It is therefore necessary to examine the legislative history to determine whether it displays evidence of the Legislature's intent.

Subdivision (c) was added to Penal Code section 484f in 1994. Although the Legislative Counsel's Digest of Assembly Bill No. 158 (1993-1994 First Ex. Sess.) proclaimed that this subdivision would "make it a crime to alter in any fashion access card account information with the intent to defraud," the declared purpose of the enactment was, more narrowly, to close "loopholes" which failed to criminalize the alteration of the "magnetic stripe information" on an access card. The Senate floor analysis reflects that the reason for the enactment was to criminalize alterations of the magnetic stripe information on the back of the access card *that would cause transactions using the card to be charged to the account of another person.* "The business community is experiencing major problems by unknowingly accepting credit cards that turn out to be in the name of one person (sometimes even the crook), but

the magnetic stripe information encoded on the back has been altered to that of another account. This situation presents a 'gray' area since there is no forgery of the cardholder's name. . . . Furthermore, it is impossible to prosecute those merely in possession of altered cards since it cannot be proven that they were the ones who actually did the altering." (Sen. Floor Analysis of Assem. Bill No. 158 (1993-1994 First Ex. Sess.) Aug. 24, 1994, pp. 2-3.)

This evidence of the Legislature's basis for enacting this subdivision supports defendant's construction of the statute. The Legislature intended this subdivision to address the situation where encoded account information "has been altered to that of another account" and to criminalize the conduct of *both* the alterer and the authorizer-possessor of the altered card. Application of the final clause of the subdivision to both the alterer and the authorizer-possessor is consistent with the Legislature's intent. Since the specific evil which the Legislature intended to address was the alteration of encoded information to that of another account, excision of this element from the alteration offense would be inconsistent with the Legislature's intent.

The applicable rules of statutory construction do not support a different conclusion. ■ "Generally, a qualifying phrase applies to the word, phrase or clause immediately preceding it, unless context or evident meaning require a different construction." (*People* v. *Cruz* (1974) 12 Cal.3d 562, 566 [116 Cal.Rptr. 242, 526 P.2d 250].) "A longstanding rule of statutory construction—the 'last antecedent rule'—provides that 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' . . ." (*White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191], citations omitted.) "There are two exceptions to the 'last antecedent rule' . . . . The first exception provides that ' "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." ' . . ." (*Id.* at pp. 680-681, citations omitted.) "Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma." (*Id.* at p. 680.) "The second exception to the 'last antecedent rule' provides that '[w]here the sense of the entire act requires that a qualifying word or phrase apply to several preceding wo[r]ds . . . , [its application] will not be restricted . . . .' . . . This is, of course, but another way of stating the fundamental rule that a court is to construe a statute ' "so as to effectuate the purpose of the law." ' . . . 'Where a statute

is theoretically capable of more than one construction [a court must] choose that which most comports with the intent of the Legislature.' " (*Id.* at p. 681, citations omitted.)

■■■ While the general "last antecedent rule" is that a clause applies only to its immediately preceding antecedent, the language of this subdivision does not come within the general rule because the final clause of the subdivision is "separated from [its] antecedents by a comma." (*White* v. *County of Sacramento, supra,* 31 Cal.3d at p. 680.) The Legislature's use of a comma to separate this clause from its antecedents is evidence that it intended the clause to apply to all antecedents rather than just the last antecedent. Taken together with the legislative history's evidence of the Legislature's intent, the application of this rule of construction compels the conclusion that the final clause of Penal Code section 484f, subdivision (c) applies to both of its antecedents.

Thus, the trial court's response to the jury's inquiry eliminated an element of the altering offense and was therefore prejudicially erroneous. The Attorney General argues that the trial court did not err in its response to the jury's inquiry because the statute does not "require actual billing or charging of another person's account" but only that "the *nature* of the alteration . . . must be *of the type that would cause* a person's [other than the cardholder's] account to be charged or billed, whether or not it *actually is* billed." (Italics added.) While the trial court might have avoided error by simply giving a negative response to the jury's inquiry, its response was not so limited. The trial court explicitly instructed the jury that the "in a manner . . ." element was not an element of this offense. Although the Attorney General originally argued on appeal that the trial court had correctly ruled that this was not an element of the offense, he abandoned that position at oral argument and now concedes that this *is* an element of the offense. We reject the Attorney General's claim that the trial court did not err in instructing the jury that this was *not* an element of the offense.

Selection of the appropriate remedy is dependent on the validity of defendant's challenge to the sufficiency of the evidence to support this element. Defendant points out that there was no evidence that any alteration was "in a manner that causes transactions initiated by that access card to be charged or billed to a person other than the cardholder to whom the access card was issued." The Attorney General maintains, without elaboration, that there was evidence to support this element of the offense. The prosecution presented no proof of the precise nature of any alterations or the effect that would result from these alterations, and no basis for a reasonable inference of the existence of this element of the altering offense appears in the record.

Consequently, retrial of this count is barred. The appropriate remedy is to strike the altering count. Because the sentence for this count was a concurrent term, there is no need for resentencing.

C.-H.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

CONCLUSION

The judgment is hereby modified so as to strike the altering count due to the insufficiency of the evidence to support it. The trial court is ordered to amend the abstract of judgment accordingly and forward a certified copy of the abstract to the Department of Corrections. The modified judgment is affirmed.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 15, 1998.

---

*See footnote, *ante*, page 1273.