[No. H017471. Sixth Dist. Apr. 22, 1999.]

SUTTER'S PLACE, INC., Plaintiff and Appellant, v.
GEORGE KENNEDY, as District Attorney, etc., Defendant and
Respondent.

## Counsel

Neilsen, Merksamer, Parrinello, Mueller & Naylor, Richard D. Martland; Arter & Hadden and Jerry M. Hill for Plaintiff and Appellant.

Wallin, Kress, Reisman & Kranitz and Peter Wallin for City of Gardena as Amicus Curiae on behalf of Plaintiff and Appellant.

Joseph R. Gordin; Friedman, Ross & Hersh and Michael J. Kass for California Card Club Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Robb & Ross and Alan J. Titus for Artichoke Joes' as Amicus Curiae on behalf of Plaintiff and Appellant.

Sidley & Austin, George Deukmejian, James M. Harris and Robert A. Holland for Cities of Commerce, Inglewood, San Bruno and San Pablo as Amici Curiae on behalf of Plaintiff and Appellant.

Munger, Tolles & Olson and Douglas A. Axel for Californians for Indian Self Reliance as Amicus Curiae on behalf of Plaintiff and Appellant.

George W. Kennedy, District Attorney, Martha J. Donohoe and Julius L. Finkelstein, Deputy District Attorneys, for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Manuel M. Medeiros, Assistant Attorney General, and Ronald L. Diedrich, Deputy Attorney General, for Department of Justice, Division of Gambling as Amicus Curiae on behalf of Defendant and Respondent.

## Opinion

**MIHARA, J.**—The issue before us in this case is whether certain card games become illegal "percentage" games when the cardroom operator permits multiple bets by a single individual on a single hand and utilizes fee collection practices under which a fixed fee is collected for each bet within one monetary range and a higher fixed fee is collected for each bet within a

higher monetary range. We conclude that such fee collection practices do not violate Penal Code section 330's percentage game prohibition.

BACKGROUND

Plaintiff has operated a 40-table cardroom in the City of San Jose since September 1994. About half of the tables in plaintiff's cardroom are used for what plaintiff calls the "California Games."[1] The cardroom does not participate as a player in the California Games. One of the players acts as the "player-banker" for two hands at a time. The player-banker position rotates around the table. The players bet against each other, and each player must bet at least the minimum bet. The player-banker is not required to match the bets of all of the other players. As the players play only against the player-banker's hand, all or several of the players may win in a particular hand if they have better hands than the player-banker.

Plaintiff provides dealer-employees for the games. The dealers do not participate in the games. The dealers deal the cards, supervise the betting action and award the pot. Each of the California Games tables has 10 "betting squares" in front of each of the 7 spots for players. Each square in front of a player may be used by that player, another player or a bystander to bet on the hand dealt to that player.

There are two types of tables in the California Games area. One type of table is what we will call the "low minimum" table. At a low minimum table, the minimum bet that can be placed in each square on the table is $10 and the maximum bet per square is $100. The other type of table is what we will call the "high minimum" table. The high minimum tables are located in what plaintiff calls the "Gold Room." The high minimum tables have a $101 minimum bet and a $200 maximum bet per betting square.[2]

Plaintiff's cardroom collects revenue by charging the participants in California Games a "collection fee" for utilization of each betting square. At the low minimum tables, the collection fee is $1 per betting square, while at the high minimum tables the collection fee is $2 per betting square.[3] The

---

[1] The remaining tables are used for poker.

[2] The City of San Jose limits the *amount* of "any single bet" by "any person playing in any game" to $200 or less, but it permits an unlimited *number* of bets by an individual on a single hand. Apparently, the city does not understand its ordinance to apply to the player-banker's wager.

[3] Defendant disputed whether the high minimum tables always enforce the $101 minimum and always charge a $2 collection fee. (See, fn. 6, *post*.)

player-banker pays a collection fee of $2 or $3 at a low minimum table and a collection fee of $5 at a high minimum table.[4]

Bets must be placed before the hand is played. The collection fee is charged each time a bet is placed in a betting square "irrespective of the dollar amount of any individual bet." The collection fees are collected separately from the bets. The cardroom provides more amenities to individuals in the Gold Room. It is more expensive for plaintiff to operate the high minimum tables in the Gold Room than it is for plaintiff to operate the low minimum tables.

On March 18, 1997, defendant notified plaintiff in writing that he had determined that plaintiff's collection fees violated Penal Code section 330 (hereafter section 330) because these fees transformed the California Games into "percentage" games within the meaning of that statute. Defendant stated that he had determined that section 330 was violated by (1) "charging each bettor a fee based upon the number of betting squares used by that bettor" and (2) "charging a higher fee for tables with higher betting limits." Plaintiff immediately brought an action for declaratory and injunctive relief against defendant. It sought a declaration that its collection fees did not violate the law and injunctive relief barring defendant from interfering with plaintiff's collection of these fees. Plaintiff's cardroom discontinued the challenged "collection fee" practices pending resolution of this action. The substitution of a "flat rate" collection system allegedly caused plaintiff's profits to fall dramatically and resulted in the City of San Jose being deprived of significant tax revenues.

The superior court denied plaintiff's request for a temporary restraining order. The trial court concluded that plaintiff had not demonstrated that it was likely to prevail on the merits and denied plaintiff's request for a preliminary injunction. Defendant answered the complaint and brought a motion for summary judgment.[5] Plaintiff also filed a motion for summary judgment or summary adjudication. Defendant conceded that the "material facts [alleged in the complaint] are not in dispute," but he opposed plaintiff's motion on the ground that plaintiff's collection fees violated section 330 "[a]s a matter of law." Alternatively, defendant challenged plaintiff's assertion, and the evidence it submitted in support thereof, that its fees could be

---

[4]There is no maximum wager for the player-banker.

[5]Defendant also brought a "nonstatutory motion" for judgment on the pleadings, asserting that the allegations of the complaint entitled *him* to declaratory relief because, based on the complaint's description, plaintiff's fee collection practices violated section 330 as a matter of law. The court ultimately denied this motion as "moot" when it granted defendant's motion for summary judgment.

justified as "a permissible charge for use of cardroom space and facilities."[6] Plaintiff asserted that its collection fees were calculated "as a function of the time required to play a hand, the personnel and equipment necessary to service the game and the amenities provided the players." It also submitted evidence that the use of more betting squares in a hand made the hand more time consuming. Defendant disputed these assertions. He claimed that plaintiff's "characterization of its fees as charges for the use of space and facilities is without evidentiary support."

Defendant took the position that "any fee related in any way to the betting, even if it is a flat per bet fee," is prohibited by section 330. "[I]t should be based on time and time only." He argued that the word "percentage" in the statute "means simply profit" and "the club is not supposed to profit from the gaming" so a per bet fee was therefore an illegal "percentage game."

After the matter had been fully briefed and argued, the trial court granted defendant's motion for summary judgment. The court stated in its written ruling that "[a]ll parties have stipulated that there are no disputed material facts . . . and that the Court in the exercise of its equitable powers may fashion any appropriate remedy justified under the applicable law and supported by the evidence in the record whether or not that particular remedy has been requested by a party." It based its ruling on its finding that "charging a separate fee for each bet by a player in games in which multiple bets by the same player are permitted, and charging a higher fee at tables with higher minimum and maximum betting limits—tie the amount collected from a player by the house to the amount that player bets." It concluded that this "tie" between the bets and the fees made the games into prohibited percentage games. "[T]here is no reason for a player to make multiple bets unless the player wishes to bet more than the limit for a single bet; the amount received by the house therefore increases in direct relation to the number of bets the player makes and the aggregate amount the player bets. In the case of higher fees charged at tables with higher minimum and maximum betting limits, the amount received by the house rises in direct relation to the minimum bet."

The court entered judgment in favor of defendant and issued a permanent injunction barring plaintiff from "(a) charging a separate fee for each bet by a player in games in which multiple bets by the same player are permitted;

---

[6]Defendant submitted evidence that a police officer had placed a $100 bet at a table in the Gold Room and had been charged a $1 collection fee. He claimed that this rebutted plaintiff's assertion that the higher cost of operating the Gold Room justified a higher collection fee. Plaintiff responded with evidence that it occasionally uses tables in the Gold Room as low minimum tables "when traffic is low" and these tables are not being utilized as high minimum tables because "a lower revenue is better than no revenue at all."

(b) charging a higher fee at gaming tables with higher minimum and maximum betting limits; (c) charging fees which are not based upon: (1) a time rental fee for occupancy at the gaming table; or (2) a predetermined fixed fee assessed of all players at the table and collected prior to the playing of the hand." It also declared the two "fee collection practices" denominated (a) and (b) to be violative of section 330. Plaintiff's summary judgment motion was denied. The parties were ordered to bear their own costs. Plaintiff's motion for a new trial was denied.[7] Plaintiff filed a timely notice of appeal from the judgment and the denial of its new trial motion.

## DISCUSSION

Plaintiff argues that its fee collection practices did not transform its California Games into prohibited percentage games within the meaning of section 330. In the original briefing submitted in this case, plaintiff made three arguments. First, it urged that these practices did not make the games percentage games as that term is defined by case law. Second, it maintained that the trial court's ruling was inconsistent with an interpretation set forth by the Department of Justice. Third, plaintiff contended that its fee collection practices were permissible under newly enacted Penal Code section 337j because those practices were not prohibited by section 330.

After the completion of the original briefing by both parties, the Legislature enacted two bills aimed at clarifying Penal Code section 337j. Both bills were passed as urgency legislation and chaptered on September 1, 1998. We authorized the parties to submit supplemental briefing on the new legislation and on a September 1998 Second District Court of Appeal decision addressing the meaning of the percentage game prohibition in section 330. In its new briefing, plaintiff asserts that the 1998 legislation expressly approves of its fee collection practices and establishes that these practices do not render its California Games in violation of section 330. Plaintiff also finds support for its original position in the Second's District's decision. Defendant responds by asserting that, to the extent that the 1998 legislation authorizes plaintiff's fee collection practices, this legislation is unconstitutional and was not properly enacted as urgency legislation. Defendant also characterizes the Second District's September 1998 opinion as "flawed" and asks us not to follow it. We conclude that the Legislature's September 1998 revision of Penal Code section 337j explicitly authorizes plaintiff's fee collection practices, is not unconstitutional and was properly enacted as "urgency" legislation. It is not therefore necessary for us to pass on the merits of the Second District's decision, which did not address Penal Code section 337j.

---

[7]The court subsequently declined to modify the judgment in response to plaintiff's contention that elimination of the minimum betting limit would eliminate the illegality of its fee collection practices.

## A. *Standard of Review*

■ "Summary judgment is granted when there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing a ruling on a motion for summary judgment, an appellate court 1) identifies the issues framed by the pleadings, 2) determines whether the moving party has established facts which negate the opposing party's and justifies a judgment in the moving party's favor, and 3) where a summary judgment motion prima facie justifies a judgment, determines whether the opposition demonstrates the existence of a triable, material factual issue. . . . Where, as here, the construction of a statute is at issue, we independently review the statute to determine the validity of the judgment. . . ." (*County of Alameda* v. *Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1691, 1697-1698 [60 Cal.Rptr.2d 187], citations omitted.)

## B. *Pre-1997 Interpretation of Section 330's Percentage Game Prohibition*

Section 330 prohibits the playing of any percentage game. "Every person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not, . . . any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of those prohibited games, is guilty of a misdemeanor . . . ." (§ 330.) As originally enacted in 1872, section 330 criminalized "any banking game." The percentage game prohibition was amended into the statute in 1885. (Stats. 1885, ch. 145, § 1, p. 135.)

■ The meaning of section 330's percentage game prohibition is a question of law. (*Sullivan* v. *Fox* (1987) 189 Cal.App.3d 673, 678 [235 Cal.Rptr. 5]; *Walker* v. *Meehan* (1987) 194 Cal.App.3d 1290, 1301 [240 Cal.Rptr. 171]; *Huntington Park Club Corp.* v. *County of Los Angeles* (1988) 206 Cal.App.3d 241, 247 [253 Cal.Rptr. 408]; cf. *People* v. *Carroll* (1889) 80 Cal. 153, 157 [22 P. 129] [plurality opinion stating that definition of a "banking" game is a question of law].) ■ " 'When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute. . . .' " (*People* v. *Ledesma* (1997) 16 Cal.4th 90, 100-101 [65 Cal.Rptr.2d 610, 939 P.2d 1310], citations omitted.)

■ *Sullivan, Walker* and *Huntington Park Club Corp.* construed section 330's percentage game prohibition in 1987 and 1988. *Sullivan* concluded

that "percentage game" was not a "technical term." "If percentage game does have a technical meaning, it is not apparent from either the face of the statute or the record . . . ." (*Sullivan* v. *Fox supra*, 189 Cal.App.3d at pp. 681-682.) Section 330 was reenacted with very minor changes in 1991. (Stats. 1991, ch. 71, § 1, p. 193.) By reenacting section 330 in 1991, the Legislature implicitly adopted the definition of percentage game set forth in *Sullivan*, *Walker* and *Huntington Park Club Corp.* "[A percentage game] finds the house in a more passive role [than a banking game]. Where the house is not directly participating in game play, it can still be involved if it collects *a percentage* from the game. This percentage may be computed from the amount of bets made, winnings collected, or the amount of money changing hands. The percentage may be assessed collectively or individually. Regardless of the precise formula employed, the house benefits. The house has no interest in the outcome of play, but it is far from disinterested in the amount of play. It is in the enviable position of obtaining profit without incurring risk of loss from the actual play. Its actual participation is nil, thereby distinguishing it from the banking game situation, but it nevertheless gains. In any event, the house derives benefit from commercial gambling, the elimination of which is the legitimate objective of statutes such as section 330. . . . [¶] We construe the language in section 330 referring to percentage game as encompassing any game of chance from which *the house collects money calculated as a portion of wagers made or sums won in play, exclusive of charges or fees for use of space and facilities. . . .*" (*Sullivan*, *supra*, at p. 679, citations omitted, italics added.)

It is a factual question whether "a particular game" falls within section 330's percentage game prohibition. (*Huntington Park Club Corp.* v. *County of Los Angeles*, *supra*, 206 Cal.App.3d at p. 249.) As the material factual allegations in the complaint were undisputed, summary judgment could not have been precluded by a material factual dispute. ▮ If the undisputed facts established that plaintiff's collection fees converted the California Games into percentage games because these fees were either a percentage or "calculated as a portion" of the bet or bets, defendant was entitled to summary judgment. If, on the other hand, these fees were not calculated as a portion or percentage of the bet or bets, plaintiff's fee collection practices would not violate section 330, and reversal would be required.

The evidence indisputably established that plaintiff's California Games were games of chance from which plaintiff collected fees. Plaintiff's California Games were played at tables that permitted the use of 60 betting squares in a single hand if a table was fully occupied by 6 players and a player-banker. The betting squares could be utilized by any of the players or any bystander. A separate fee was incurred for use of each betting square.

The amount of the fee for each bet did not vary at a particular table, but did vary depending upon whether the table was a low minimum table or a high minimum table. At the low minimum tables, the collection fee was $1 per betting square, while at the high minimum tables the collection fee was $2 per betting square. While the amount of the fee did not vary at a particular table, the amounts of the various bets placed by players or bystanders on the many betting squares on the table could vary in a wide range. At a low minimum table, a betting square could be used for any bet of between $10 and $100. At a high minimum table, a betting square could be utilized for any bet of between $101 and $200.[8]

The primary argument made by defendant is that plaintiff's restriction of the size of the bet at a particular table and variance of the collection fee between the two types of tables established some sort of relationship between the amount of the bet and the amount of the collection fee. On this basis, he maintains that the collection fees charged by plaintiff were at least an approximation of a "portion" or "percentage" of the amounts bet by players and bystanders. If defendant's argument were correct, collection fees charged on a per bet basis would almost always be violative of section 330 if there were any restrictions on the size of the bet to which the flat charge collection fee attached. Defendant also expresses the belief that permitting per bet collection fees wrongfully encourages cardrooms to adopt fee collection practices which do *not* involve the collection of an actual "percentage" or portion of the bets but instead collect "flat" fees of different amounts for each bet within very limited betting ranges. He envisions such a fee collection practice as an end run around section 330.

*Sullivan*'s definition of section 330's percentage game prohibition does not explicitly or implicitly globally prohibit per bet collection fees. Whether section 330's percentage game prohibition should be interpreted to prohibit flat charge per bet collection fees is a question which was not considered nor resolved in *Sullivan* and therefore is a question of first impression which we must resolve under the law *now in effect.* (*Hays* v. *Wood* (1979) 25 Cal.3d 772, 782 [160 Cal.Rptr. 102, 603 P.2d 19] [" ' "Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court" ' "].) When we consider this question under the current law, it becomes clear that defendant's concerns have been specifically addressed by the Legislature's adoption of a comprehensive fee collection scheme which prohibits cardrooms from adopting fee collection practices that undermine section 330's percentage game prohibition.

---

[8]The City of San Jose's local ordinance prohibited "a single bet" of more than $200. This ordinance was enforced on a per-betting-square basis only. An individual player or bystander was permitted to place *multiple* bets which *totalled* in excess of $200 by using multiple betting squares in a single hand.

## C. *New Legislation*

Plaintiff argues that the 1997 enactment of the Gambling Control Act by the Legislature and the 1998 amendment of Penal Code section 337j author-izes its fee collection practices. (Bus. & Prof. Code, § 19800 et seq.; Pen. Code, § 337j; Stats. 1997, ch. 867, § 3.)

### 1. *1997 Legislation*

One of the statutes added as part of the Gambling Control Act was Penal Code section 337j. (Stats. 1997, ch. 867, § 59.) Penal Code section 337j contains provisions regarding permissible fees for a "controlled game." This statute defines "controlled game" as "any game of chance, including any gambling device, played for currency, check, credit, or any other thing of value *that is not prohibited and made unlawful by statute* or local ordinance." (Pen. Code, § 337j, subd. (e)(1), italics added.) Penal Code section 337j, as it read when it took effect on January 1, 1998, prescribed the exclusive means by which fees could be collected in connection with a "controlled game."

"(f) It is unlawful for any person to collect any fee in connection with a controlled game . . . unless the method of fee collection conforms to regulations adopted by the Division of Gambling Control of the Department of Justice or the California Gambling Control Commission. Until those regulations become operative, an owner licensee may continue to collect fees, in accordance with any of the following provisions: [¶] (1) In the same manner as fees were collected in the establishment as of January 1, 1997, if the method of fee collection is permitted by ordinance, resolution, letter, or other written authorization of the local governmental entity having regula-tory jurisdiction or law enforcement authority over the gambling establish-ment. [¶] (2) In the same manner as fees were collected in the establishment as of January 1, 1997, if all of the following are true: [¶] (A) The amount of the fee is fixed in advance of the game. [¶] (B) There is no minimum wager in any game, round, or hand. [¶] (C) No fee is deducted from the amount wagered. [¶] (D) In any game or round, the same fixed fee is collected from all players at the table. [¶] (E) The method of fee collection has not been challenged by, and is not prohibited by any ordinance or resolution of, the local governmental entity having regulatory jurisdiction or law enforcement authority over the gambling establishment. [¶] (3) Using any method of fee collection that is otherwise authorized by law." (Former Pen. Code, § 337j, subd. (f).)

The 1997 legislation which enacted Penal Code section 337j was accom-panied by a codified statement of the Legislature's intent. "The Legislature

hereby finds and declares all of the following: [¶] (a) The longstanding public policy of this state disfavors the business of gambling. State law prohibits commercially operated lotteries, banked or percentage games, and gambling machines, and strictly regulates parimutuel wagering on horse racing. *To the extent that state law categorically prohibits certain forms of gambling and prohibits gambling devices, nothing herein shall be construed, in any manner, to reflect a legislative intent to relax those prohibitions.* [¶] . . . [¶] (c) (1) Unregulated gambling enterprises are inimical to the public health, safety, welfare, and good order. Accordingly, no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state and by the ordinances of local governmental bodies. [¶] . . . [¶] (e) It is not the purpose of this chapter to expand opportunities for gambling, or to create any right to operate a gambling enterprise in this state or to have a financial interest in any gambling enterprise. Rather, it is the purpose of this chapter to regulate businesses that offer otherwise lawful forms of gambling games." (Bus. & Prof. Code, § 19801, italics added.)

Two bill analyses of this legislation indicate that the Legislature was aware of the trial court's decision in this case and was considering that decision in enacting this 1997 legislation. (Assem. Government Organization Com. Analysis, Sept. 12, 1997; Sen. 3d reading analysis, Sept. 9, 1997.) These analyses contain the following comments on this case. "In Sutter's Place, Inc., dba Bay 101 v. George Kennedy (1997), the Santa Clara County Superior Court ruled that the practice of charging a higher fee at tables with higher minimum and maximum betting limits turned a game into a percentage game. Moreover, the court ruled that the practice of charging a separate fee for each bet by a player in a game in which multiple bets by the same player are permitted tie the fee to the amount of the wager. Some, however, contend that the Sutter's Place decision constitutes a significant expansion of the prior appellate court decisions. They argue that law enforcement officials throughout the state have acknowledged that it is permissible for the fee to vary depending upon the game played and the amount wagered. This bill would statutorily clarify the acceptable table fee collection methods for card clubs. Specifically, the bill would require that the fee collection conform with regulations adopted by the division or the commission. Until those regulations become operative, however, the bill would allow the clubs to use the same fee collection methodology they used as of January 1, 1997, as long as they meet certain conditions."[9] (Assem. Government Organization Com. Analysis, Sept. 12, 1997; Sen. 3d reading analysis, Sept. 9, 1997.)

[9]The Division of Gambling Control subsequently promulgated "Proposed Temporary Regulations." These regulations would require that "the same fixed fee must be collected from each and every player at the table" and would prohibit a cardroom from "calculat[ing] a fee

## 2. *1998 Legislation*

Two pieces of "urgency" legislation were chaptered on September 1, 1998. Both Assembly Bill No. 518 (hereafter Assembly Bill 518) and Assembly Bill No. 2415 (hereafter Assembly Bill 2415) amended Penal Code section 337j. Assembly Bill 518 added a new subdivision (g) to Penal Code section 337j, which specifically authorized "[f]lat fees" to be collected on a per bet basis and at "different collection rates" so long as there were no more than three "different collection rates" at a particular table. "This subdivision is intended to be dispositive of the law relating to the collection of player fees in gambling establishments. No fee may be calculated as a portion of wagers made or from winnings earned. Fees charged for all wagers shall be determined and collected prior to the start of play of any hand or round. Ample notice shall be provided to the patrons of gambling establishments relating to the assessment of fees. Flat fees on each wager may be assessed at different collection rates, but no more than three collection rates may be established per table. This legislation codifies the holding in Sullivan v. Fox (1987) 189 Cal.App.3d 673 [235 Cal.Rptr. 5], as to the collection of player fees in licensed gambling establishments, that no fee shall be calculated as a portion of wagers made or winnings earned, exclusive of charges or fees for the use of space and facilities."[10] (Assem. Bill 518, Stats. 1998, ch. 423, § 2.).)

Assembly Bill 2415 also amended Penal Code section 337j "as amended by Assembly Bill 518 . . . ." (Stats. 1998, ch. 424, § 1.) It added a new subdivision (f) to Penal Code section 337j, which was identical to the subdivision (g) added by Assembly Bill 518. The difference between the two bills was that Assembly Bill 2415 eliminated the original subdivision (f) of Penal Code section 337j while Assembly Bill 518 retained the original subdivision (f). ██ ██ Section 2 of Assembly Bill 2415 provided

---

based on the amount wagered by any player or players . . . ." We have not been informed by any of the parties whether these proposed regulations have ever been finalized.

[10]The legislative history of Assembly Bill 518 unambiguously reflects that it was intended to resolve the case before us. Assembly Bill 518 was billed as "a clean-up measure to SB 8 . . . ." Senate Bill No. 8 was the 1997 legislation that enacted Penal Code section 337j. The Assembly Floor Analysis of Assembly Bill 518 explicitly referred to the instant matter and stated that the trial court's decision which we are reviewing "appears to go beyond the prior appellate court decisions." The Senate Floor Analysis of Assembly Bill 518 was even more explicit. "This legislation codifies existing case law, clarifies the legislative intent as expressed in the Gambling Control Act as to the collection of fees in licensed gaming establishments, and *resolves the pending dispute over fee collections now pending in the California Court of Appeal, Sixth Appellate District in the case entitled Sutter's Place v. Kennedy (Sixth Appellate District Case No. H017471; Santa Clara Superior Court Case No. CV 764875).*" (Italics added.) The Legislature could not have been much more explicit about its intent.

that Assembly Bill 2415 "shall become operative only if [Assembly Bill] 518 is enacted and becomes effective on or before *January 1, 1998*."[11] (Italics added.) Both bills identified the "urgency" which justified their immediate effectiveness as the need to "clarify the law with regard to the collection of player fees in gambling establishments and to address the legality of those fees, at the earliest possible time." (Stats. 1998, chs. 423, § 4, 424, § 3.)

### D. *Validity of Plaintiff's Fee Collection Practices Under the Current State of the Law*

On its face, the 1998 legislation appears to be the governing law on the legality of cardroom fee collection practices. The 1998 legislation explicitly authorizes the fee collection practices utilized by plaintiff prior to this action and declared illegal and enjoined by the trial court. Defendant challenges the validity of the 1998 legislation.

#### 1. *Constitutionality*

Defendant asserts that a 1984 addition to the California Constitution transformed section 330's statutory percentage game prohibition into a *constitutional* prohibition on percentage games which precluded subsequent clarification of section 330 by the Legislature. We find the 1998 legislation constitutional.

"[T]he entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body

---

[11]Defendant mentions this drafting error in Assembly Bill 2415 but does not challenge the effectiveness of Assembly Bill 2415 on that basis. Assembly Bill 2415 was originally introduced on February 20, 1998, but section 2 was not amended into the bill until August 28, 1998. Assembly Bill 518 was originally introduced on February 24, 1997, but it was not transformed into an act amending Penal Code section 337j until August 13, 1998. "We recognize the basic principle of statutory and constitutional construction which mandates that courts, in construing a measure, not undertake to rewrite its unambiguous language. . . . That rule is not applied, however, when it appears clear that a word has been erroneously used, and a judicial correction will best carry out the intent of the adopting body." (*People* v. *Skinner* (1985) 39 Cal.3d 765, 775 [217 Cal.Rptr. 685, 704 P.2d 752], citation omitted.) Here, it is absolutely clear that the date "January 1, 1998" was a drafting error where the Legislature intended to use the date "January 1, 1999." Assembly Bill 2415 was not even introduced prior to "January 1, 1998." It was not until August 1998 that Assembly Bill 518 became a bill seeking to amend Penal Code section 337j and the section containing the "January 1, 1998" date was added to Assembly Bill 2415. In this context, it is unquestionable that the Legislature intended for Assembly Bill 2415 to take effect so long as Assembly Bill 518 took effect on or before January 1, 1999. We therefore make the "judicial correction" authorized by *Skinner* and hold that Assembly Bill 2415 was effective because Assembly Bill 518 took effect prior to January 1, 1999.

may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution. . . . [¶] [A]ll intendments favor the exercise of the Legislature's plenary authority: 'If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used.' . . ." (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161], citations omitted.)

■ In 1984, the voters of this state approved a new provision of the California Constitution permitting the establishment of the California State Lottery. (Cal. Const., art. IV, § 19, subd. (d).) Prior to the enactment of that provision, the California Constitution had barred all lotteries. In conjunction with their approval of the California State Lottery, the voters enacted a separate constitutional provision limiting the Legislature's authority to authorize certain types of "casinos." "The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e) (hereafter section 19(e).)

Defendant argues that the voters' intent in enacting section 19(e) was to incorporate all of the Penal Code's gambling prohibitions into the California Constitution. As noted above, constitutional restrictions on the Legislature's power to act are strictly construed and doubts are resolved in favor of the Legislature's actions. (*Methodist Hosp. of Sacramento* v. *Saylor*, *supra*, 5 Cal.3d 685.) Construction of a constitutional provision or statute necessarily begins with the language of the provision. (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420].) Only where the meaning of the language is unclear do we resort to extrinsic evidence of the intent of the enactors. (*People* v. *Steffens* (1998) 62 Cal.App.4th 1273, 1283-1284 [73 Cal.Rptr.2d 314].) The language of section 19(e) does not purport to incorporate the Penal Code's gambling prohibitions into the California Constitution. Instead, on its face, section 19(e) prohibits the Legislature from permitting certain types of casinos. The Penal Code contains no counterpart to section 19(e) which prohibits these specific types of casinos.

The only potential ambiguity in section 19(e) is what type of casinos were "operating in Nevada and New Jersey" in 1984. Defendant does not attempt to establish that, in 1984, Nevada and New Jersey casinos were operating card games using fee collection practices like those utilized by plaintiff for its California Games. The 1984 ballot pamphlet contains no information on the precise nature of the games being offered by Nevada and New Jersey

casinos in 1984. It is common knowledge that Nevada and New Jersey casinos operate games in which the casino itself acts as the "bank" or takes an *actual percentage* of the wagers. (*Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 679.) Plaintiff's fee collection practices do not involve the cardroom taking an actual percentage of the wagers.

Defendant claims that a 1994 California Attorney General opinion concluded that the voters' 1984 enactment of section 19(e) incorporated all of the Penal Code's gambling prohibitions into the California Constitution. The cited opinion states "related to the [constitutional] prohibition against 'Nevada and New Jersey type' casinos, [the Legislature] has expressly banned various forms of gambling (§§ 330-336)." (77 Ops.Cal.Atty.Gen. 108, 109 (1994).) Obviously, this does not support defendant's assertion. While section 330's ban on certain games is "related to" the Constitution's ban on Nevada-style and New Jersey-style casinos, the fact that the two provisions are *related* does not come close to establishing that the two provisions are *identical.* The Attorney General's opinion did not even suggest that section 19(e) incorporated section 330 into the Constitution.

Defendant also maintains that the "[t]he appellate courts have agreed" with the position that he claims the Attorney General took in that opinion. This too is unsupported by his sole citation. He cites *Bell Gardens Bicycle Club* v. *Department of Justice* (1995) 36 Cal.App.4th 717 [42 Cal.Rptr.2d 730]. This appellate case dealt with the issue of whether a certain game was an illegal "lottery." Prior to the voters' 1984 amendment of the California Constitution, the California Constitution explicitly banned all lotteries. The 1984 amendment added a provision permitting the establishment of the California State Lottery. The issue before the court in *Bell Gardens Bicycle Club* was whether the game in question was or was not a *lottery.* The constitutional and statutory provisions prohibiting lotteries are independent of section 19(e) and section 330. The court in *Bell Gardens Bicycle Club* had no opportunity to, and did not, hold that section 19(e) incorporated section 330 into the Constitution.

Even if we were to assume arguendo that the voters intended to incorporate section 330 into the Constitution through section 19(e), it would be impossible for us to conclude, applying a strict construction and resolving doubts in favor of the Legislature's action, that section 19(e) incorporated an *interpretation* of section 330's percentage game prohibition into the Constitution which prohibited the Legislature from permitting games in which no "percentage" was taken by the house. At the time of the enactment of section 19(e), section 330's percentage game prohibition had never been construed. (*Sullivan* v. *Fox, supra,* 189 Cal.App.3d at p. 678.) If the voters believed that

their ban on Nevada- and New Jersey-type casinos would incorporate section 330's ban on banking and percentage games, the only reasonable inference is that the voters believed that section 330's percentage game prohibition barred games of the type offered by these out-of-state casinos in which the house collected a percentage of the wagers. *Sullivan* did not issue its interpretation of section 330 until 1987, and it was the first court to interpret the percentage game prohibition. (*Sullivan, supra,* at p. 678.) We think it unlikely that the voters of this state not only silently intended to incorporate section 330 into the Constitution but also silently wished to incorporate a construction of that section which prohibited games which were not facially prohibited by section 330. A strict construction of section 19(e) precludes such an interpretation.

### 2. *Urgency*

Defendant also claims that there was no "emergency" justifying the enactment of these two bills as "urgency" legislation. While legislative enactments ordinarily take effect on the first day of the January following their passage, "urgency statutes shall go into effect immediately upon their enactment." (Cal. Const., art. IV, § 8, subd. (c)(3).) "Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety. A statement of facts constituting the necessity shall be set forth in one section of the bill." (Cal. Const., art. IV, § 8, subd. (d).)

"[A] declaration of urgency by the Legislature will not be declared invalid 'unless it "appears *clearly and affirmatively from the* [*L*]*egislature's statement of facts that a public necessity does not exist*." . . .' 'If there is any doubt as to whether the facts do or do not state a case of immediate necessity, that doubt should be resolved in favor of the legislative declaration . . . .' . . . The reason for this rule is that the question whether such necessity exists is one of fact to be determined by the Legislature. . . ." (*Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243, 1253-1254 [48 Cal.Rptr.2d 12, 906 P.2d 1112], citations omitted.)

The Legislature stated that it was necessary for the 1998 legislation to take effect immediately because there was an urgent need to "clarify the law with regard to the collection of player fees in gambling establishments and to address the legality of those fees at the earliest possible time." (Stats. 1998, chs. 423, § 4, 424, § 3.) Our role is not to second-guess the Legislature. The Legislature's statement of facts did not *affirmatively* establish that there was *no* public necessity for the enactment of these two bills. The Legislature could have found that uncertainty about the legality of certain fee collection practices was disturbing the "public peace" by harming lawful business in

this state and depriving municipalities of the tax revenue that lawful fee collection practices would produce. We decline defendant's invitation for us to denigrate the Legislature's motivation for enacting these laws. The applicable standard of review requires us to credit the Legislature's statement of facts in this case and resolve all doubts in favor of the Legislature's declaration. Under this standard, the Legislature's assessment of the urgent need for this legislation must be upheld.

### 3. *Oliver v. County of Los Angeles*

Contending that *Oliver v. County of Los Angeles* (1998) 66 Cal.App.4th 1397 [78 Cal.Rptr.2d 641] is "flawed," defendant urges us not to follow it and notes, in a footnote, that plaintiff's California Games might be considered "banking games" under *Oliver*'s analysis. *Oliver* did not consider the impact of the 1998 legislation which explicitly authorized plaintiff's fee collection practices. We therefore see no need to consider *Oliver*'s analysis of section 330's percentage game prohibition. Nor is there any need to consider defendant's suggestion that plaintiff's California Games may be banking games under *Oliver*. This case is before us after a summary judgment for defendant. Defendant did not seek summary judgment on the ground that plaintiff's California Games were banking games. The judgment entered by the court declared that plaintiff's *fee collection practices* violated section 330. This judgment could not be upheld on the ground that plaintiff's California Games were banking games. The validity of plaintiff's fee collection practices is independent of any determination as to whether plaintiff's California Games constitute banking games within the meaning of section 330. The question of whether plaintiff's California Games are banking games is simply not before us on appeal in this case.

### CONCLUSION

The judgment is reversed. The parties shall bear their own costs.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.